DILLON MATERIALS HANDLING, INC., Plaintiff-Appellant,

v.

ALBION INDUSTRIES, DIVISION OF KING–SEELEY THERMOS COMPANY, Defendant-Appellee.

No. 76–3670.

United States Court of Appeals, Fifth Circuit.

Feb. 16, 1978.

Rehearing Denied March 16, 1978.

Paul M. Thorp, Dallas, Tex., Jack N. Price, Austin, Tex., for plaintiff-appellant.

Richard G. Rogers, Stanley E. Neely, Dallas, Tex., for defendant-appellee.

Before TUTTLE, COLEMAN and RONEY, Circuit Judges.

TUTTLE, Circuit Judge:

This is an appeal from a judgment n. o. v. entered by the district court in an antitrust case. The appellant, Dillon Materials Handling, Inc. (hereinafter "Dillon"), was the exclusive stocking distributor for the appellee, Albion Industries, Division of King-Seeley Thermos Co. (hereinafter "Albion"), in the Dallas, Texas area from November 1971 until March 1974. Albion terminated Dillon's distributorship in March 1974, and Dillon responded with this law suit, alleging violations of section 1 of the Sherman Act and section 3 of the Clayton Act. Following an 11-day trial, the district court submitted the case to the jury, which held for the defendant on the Sherman Act claim [1] and for the plaintiff on the Clayton Act claim.[2] The district court, however, granted defendant's motion for judgment n. o. v. on the Clayton Act claim, precipitating this appeal. We affirm.

This litigation involves the caster industry, which may be divided into three basic categories: decorative, institutional and commercial, and industrial. Within each category, different types of casters are further identifiable by capacity and application. "Decorative" casters normally are used on furniture, while "institutional and commercial" casters are used on various carts and other rolling equipment commonly found in hospitals, schools and department stores. "Industrial" casters encompass those products whose attributes include a higher load capacity and rollability. At least 25 manufacturers [3] compete on a nationwide basis for a share of the markets represented by each of the three categories described above. During the relevant time period, Albion did not offer an institutional line, but did produce the "most complete line" of industrial casters.

Around January 1969, Dick Davis, who later became president of Dillon, was appointed a distributor for the "Colson" line of casters in the Dallas, Texas area. Specifically, Davis purchased the "Colson Southwest Branch" in Dallas, thereby acquiring $34,000 worth of inventory, a place of business and three employees. At the time Colson did not offer a decorative line and its industrial line, in Davis' opinion, was not "complete." Over two years later, in May 1971, Davis purchased Dillon Scale and Equipment Company, which he combined with the Colson Southwest Branch. Davis eventually acquired a line of decorative casters manufactured by Shepherd Products, U.S., Inc. and began marketing Colson and Shepherd casters under a new corporate name, Dillon Materials Handling, Inc.

Davis thereafter surveyed his competition and determined that no other company in the Dallas market was offering a complete line of casters or emphasizing casters as a primary product in the materials handling field.[4] He decided to capitalize on this void and began a search for a more complete line of industrial casters to combine with the Colson and Shepherd lines. Other distributors suggested that he attempt to secure the Albion line, since it was considered to be "the most complete line in the market." Davis' initial attempt to secure the Albion distributorship in Dallas failed. However, when the extant distributor, A. C. Andrews Co., went bankrupt in 1971, Davis initiated negotiations which led to the appointment

---

1. Dillon's First Amended Complaint alleged that Albion had violated section 1 of the Sherman Act, 15 U.S.C. § 1, by imposing territorial restrictions on the sale of Albion products through its distributors, including Dillon. The jury concluded that although Albion had established exclusive territories for the resale of its products, Dillon's distributorship was not cancelled in an effort to effectuate that system. The jury's findings in this regard are not challenged on appeal.

2. The money damages awarded Dillon by the jury totalled $121,833.

3. The evidence as to the exact number was inconclusive. Mr. Dick Davis, the president of Dillon, testified that there probably are 20 to 25 caster and wheel manufacturers and an additional 12 companies that manufacture only wheels. However, Albion's president, Mr. Richard H. Dobbins, said in his deposition that there are over 100 caster manufacturers nationwide.

4. Dillon's arrangement with Colson included, in addition to casters, the sale of wheel cars, stretchers and other products.

of Dillon as an Albion distributor. After meeting with Albion's sales manager, Bud Fierke, and president, John Karmalski, Davis secured the Dallas distributorship for Dillon in November 1971.

Davis characterized Dillon's relationship with Albion during 1972 as "super." Sales of Albion's products approached $100,000 for that year. In March 1973, however, Davis was visited by Albion's newly appointed sales manager, Bob Brettelle, who told Davis that "Albion [wanted] some more business from Dillon." [5] Brettelle suggested that "[y]ou can start by giving us some of that Colson business." He also complained about the fact that Davis had opened a cart fabrication business in Oklahoma.[6] Brettelle did not return to Dallas in 1973.

After Brettelle's visit, the relationship between Albion and Dillon "deteriorated." Dillon experienced increased delays in obtaining shipments from Albion and, in addition, lost two sizeable accounts during the year.[7] Finally, in February 1974, Brettelle made a return visit to Dallas and terminated Dillon's distributorship. Subsequent

conversations between Davis and Richard Dobbins, who succeeded Karmalski as president of Albion on January 1, 1972, failed to alter Albion's position. The Dallas distributorship subsequently was awarded to Casters of Dallas, Inc. (hereinafter "Casters"), a materials handling concern formed by Wes Hale and Truman Powers. Hale served as president of Casters, while Powers was president of B & F Casters, a Houston, Texas company that held the Albion distributorship in Houston.

On September 19, 1974, Dillon filed suit against Albion, alleging numerous violations of the federal antitrust laws. The specific allegation involved in this appeal is that Albion imposed on its distributors an exclusive dealing policy which required the distributors not to sell casters manufactured by Albion's competitors, in violation of section 3 of the Clayton Act.[8] Dillon claimed that its distributorship was terminated because of non-compliance with the policy and that it lost sales as a result.[9] The jury concluded that Albion had violated section 3 in the manner alleged and award-

---

5. In its brief, Dillon attempts to negate any inference of an inadequate sales volume by pointing out that its 1972 sales ($100,000) far exceeded the 1971 sales of its predecessor, A. C. Andrews Co. Although it is true that Andrews sold only $12,000 worth of Albion products in 1971, the company was on the verge of bankruptcy early in 1971 and did finally declare bankruptcy later that year. Thus, although Davis may have thought that Brettelle had no reason to complain about the first-year sales, a quantitative comparison of Andrews' and Dillon's annual sales is of little value.

6. In early 1973, Davis established a cart fabrication operation called Materials Handling, Inc., expecting to thereby increase his caster sales. Brettelle's concern in this regard was that other cart manufacturers which purchased Albion casters might object to competition from a company as closely associated with Albion as was Dillon. Later, after the fabrication plant began production, Brettelle objected to the amount of time Davis spent at the plant.

7. The record shows that the 1973 shipment delays were attributable at least in part to an industry-wide materials shortage and a sudden influx of new business. There also was testimony that Dillon had a similar problem with other manufacturers. We mention this evidence only to negate any inference that the

shipping delays were a form of retaliation for any of Dillon's business practices to which Albion objected.

8. The complaint charged that this policy constituted a "per se" violation of the Clayton Act; however, it is well settled that exclusive dealing arrangements are not per se illegal. *Hoopes v. Union Oil Co.*, 374 F.2d 480, 486 (9th Cir. 1967), *citing Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 333, 335, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

9. Dillon's expert witness, Dr. Stanley Block, testified that the company experienced a "rather precipitous dropoff of caster sales" after the termination. There were decreased sales of the Albion line and of other lines, although both categories of losses were said to be attributable to the termination. As a non-distributor, Dillon still had access to the Albion line but enjoyed a lower discount and had to absorb some additional freight expenses. Davis testified that because of these increased prices Dillon could not offer the Albion line on a competitive basis, resulting in decreased sales. Some customers dropped Dillon altogether because of its inability to supply Albion, supposedly causing lost sales of other casters.

ed damages to Dillon. A judgment n. o. v. was entered by the district court because there was "insufficient evidence to support the jury's implicit finding that the effect of any exclusive dealing agreement may have been to substantially lessen competition or tend to create a monopoly in a line of commerce."[10] It is from this judgment that Dillon appeals and to which we must now turn our attention.

In pertinent part, section 3 of the Clayton Act provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14. Since there was no question that Albion was engaged in commerce or that the Dillon-Albion distributorship agreement was a contract for the sale of goods, Dillon's burden of proof at trial was two-fold. First, it was required to show that its purchases as a distributor of Albion casters were made on the "condition, agreement, or understanding" that it would not sell non-Albion casters. Second, it had to show the requisite effect on competition. As previously mentioned, the district court held that the evidence was insufficient to support the jury's finding that the latter showing had been made. Our review is governed by the standards announced in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–75

(5th Cir. 1969) (en banc). After a careful study of the entire record, we agree with the findings of the district court and, in addition, hold that there was insufficient evidence to support the jury's finding that sales to Albion distributors were made upon a condition, agreement or understanding of exclusivity.

■ As an initial matter, it is important to note that the written distributorship agreement between Albion and Dillon in no way restricted Dillon's right to sell competitive goods. And none of the correspondence between the two companies mentioned such a restriction. In the absence of an express exclusivity requirement, however, an antitrust plaintiff is not foreclosed from making out a case. A course of dealing between seller and buyer may "ripen into an implied or informal agreement or understanding." *McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332, 337 (4th Cir. 1959). The existence of such an agreement or understanding, of course, must be evaluated in light of all the circumstances peculiar to the case at hand. *Cf. Frey & Son, Inc. v. Cudahy Packing Co.*, 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892 (1921); *United States v. A. Schrader's Son, Inc.*, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920).

Dillon's proof in this regard consisted almost entirely of comments made during several conversations between Davis and Albion management. And although Dillon sold casters manufactured by companies other than Colson,[11] the evidence primarily relates to Dillon's sales of the Colson line. First, Dillon points to the October 1971 negotiating session between Davis, Fierke and Karmalski. It must be remembered that Davis initiated these discussions and, to ensure that his bid for the distributorship

---

**10.** The district court recited an additional basis for the j. n. o. v.—insufficient evidence to support the jury's finding of damages attributable to Dillon's lost profits from the sale of non-Albion casters. Although Dillon disputes this finding, our disposition of the appeal makes it unnecessary for us to consider the question.

**11.** Davis testified that in addition to Albion and Colson, Dillon sold casters manufactured by

Jarvis & Jarvis, Fairbanks, Hamilton, Devine, Bridge Wheel, Gleason, Saginaw, Rapistan and Jakes. Charles S. Rhoads, Dillon's sales manager, added to this list the names of other "major" lines, including Bassick, Nutting, Midwest, Shepherd and R & K. The record makes it clear that Colson, Fairbanks, Nutting and Hamilton marketed industrial casters similar to at least part of the Albion line.

was successful, Davis had to sell himself and Dillon to Albion's management.

Davis initially met with Albion's sales manager, Bud Fierke. He told Fierke about Dillon's operation and that Dillon was a Colson distributor. Davis testified that Fierke was "very interested in our relationship with Colson," although it is plain that Fierke never directed or asked Davis either to quit selling or phase out the Colson line. Davis, however, in what obviously was a purely gratuitous sales pitch, told Fierke that Albion would receive all of Dillon's caster sales in the Albion "62 series and up," since in Davis' opinion Colson did not manufacture industrial casters competitive with that portion of the Albion line. Fierke apparently was impressed with Davis' presentation, and the two men proceeded to a meeting with Albion's president, John Karmalski.

Davis' recollection of the meeting with Karmalski was as follows:

[T]he Colson line was brought up again and I reiterated to Mr. Karmalski—he was concerned, he told me that Colson distributors—they felt that Colson was a potential competitor for them and that where they had gone with Colson distributors before, they weren't pleased with it. I told [Karmalski and Fierke] again that Colson's line does not compete with Albion's line for what my needs were in [the Dallas] market, which was an industrial caster . . . .

Karmalski never stated or intimated that Dillon would be required to discontinue sales of Colson casters or any other products manufactured by Albion's competitors. Even when considered in the light most favorable to Dillon, these conversations evidence no more than an unsolicited pledge on Davis' part that Dillon would not sell certain Colson products that he considered *not* to be competitive with Albion's line.

Davis, of course, was successful in his bid for the distributorship, which was confirmed by a November 23, 1971 letter from Bud Fierke. Neither that letter nor Davis' response mentioned any restriction on the sale of non-Albion casters. And, according to Davis' own testimony, during 1972 nobody at Albion complained that Dillon was handling Colson or selling items that were competitive with Albion's line. The Colson topic, however, did surface during Bob Brettelle's March 1973 visit, although there is some dispute as to exactly what was said. Davis testified that Brettelle requested more business from Dillon and that Dillon could start by "giving [Albion] some of that Colson business." Brettelle's recollection of the conversation differed. He testified that although he mentioned that it "was unusual for Colson and Albion to be in the same house," he did not suggest any diversion of sales to Albion. Brettelle testified that Dillon's sales for the first few months of 1973 were down and that he simply told Davis that sales of Albion products had to increase. The jury, of course, was free to believe Davis' testimony rather than Brettelle's. Even so, it would not have been reasonable to interpret Brettelle's remarks as a suggestion or demand that Dillon discontinue its sales of competitive goods.

The final phase of Dillon's proof centers around Albion's termination of the distributorship and the appointment of Casters of Dallas as Dillon's successor. According to Davis, when Brettelle cancelled the distributorship [12] in February 1974, he told Davis: "Dick, everyone knows you are married to Colson. You are just giving us problems. You are even running around making speeches for Colson.[13]" And in a subsequent telephone conversation with Richard Dobbins, Albion's president, Dobbins told

12. The distributorship agreement required 30-days written notice of termination. It is agreed that Albion satisfied this contractual requirement.

13. The speech referred to by Brettelle was given by Davis at one of Colson's annual sales meetings for field sales personnel and manage-

ment. The text was introduced into evidence as Plaintiff's Exhibit 1. Although Davis encouraged the group to complete their line by offering Albion's industrial casters, he also listed "married to Colson" as one of three "musts" in distributor marketing. He also noted that 50 percent of Dillon's annual sales went to Colson.

Davis that "if it wasn't for Colson we wouldn't have been having a problem in the first place.[14]" Dillon also asserts that Casters of Dallas was awarded the Dallas distributorship on the condition that non-Albion products not be sold. The record, however, does not support this assertion. Although Wes Hale and Truman Powers testified that in light of Dillon's experience they did not think it would have been "a good idea" to handle Colson and that they promised to place their "major emphasis" on Albion in Dallas, the record shows that Casters of Dallas actually sold and continues to sell competitive goods.[15]

At trial, Brettelle did not deny that Dillon's sale of Colson casters was one of the reasons[16] for termination. He insisted, however, that Dillon was not terminated because it sold competitive goods but because Dillon was not selling enough Albion. A memorandum Brettelle wrote after his meeting with Davis confirms Brettelle's concern that Dillon had not been "pushing" the Albion line as it should have.[17] To be sure, Dobbins testified that one reason for the termination was Dillon's "inability or refusal to promote Albion's full line of products." Dobbins' testimony was reiterated by Wes Hale and Truman Powers, who said that in their discussions with Brettelle and Dobbins, both had expressed the feeling that most of Dillon's sales were going to Colson. In short, the evidence is at least as consistent with Albion's claim that Dillon was terminated in part because of a lack of Albion sales as with Dillon's contention that it was terminated for the mere sale of Colson casters.

On the basis of the evidence outlined above, we think it clear that there was insufficient proof for a reasonable jury to have concluded that Dillon and Albion had even an informal agreement or understanding of exclusivity.[18] Even more unsubstantiated were Dillon's claim and the

---

14. Davis' response was "that never was the deal with the company and [Albion isn't] losing any business because I [have] Colson." During an earlier conversation with Dobbins, Davis attempted to salvage the distributorship by offering to "set up a separate company strictly to handle Albion." Both statements underscore the fact that Dillon in fact sold non-Albion casters.

15. Wes Hale, the president of Casters of Dallas, initially approached Truman Powers to secure financial assistance for his company. At the time, Hale was attempting to secure the Faultless line in Dallas. Hale testified that although Faultless had a heavy-duty industrial line, he went after Albion because Powers "was having success in the Albion product *in conjunction with Faultless* in the Houston area." Powers testified that his company, which serves as the Albion distributor in Houston, and Casters of Dallas handle essentially the same lines, including Albion, Faultless, Hamilton, Nutting and others.

16. Brettelle testified that in addition to Dillon's relationship with Colson, the following factors entered into the decision to terminate: (1) decreased sales, (2) inadequate advertising, and (3) credit difficulties. Significantly, Brettelle stated that Dillon's distributorship would have been cancelled even if Dillon had ceased all sales of Colson casters.

17. In particular Brettelle noted that most of Dillon's inventory appeared to be Colson rather than Albion. In addition, the record shows that in 1973 Dillon sold $147,000 worth of Colson casters and only $58,622.05 worth of Albion. Dillon did sell some $21,000 worth of Albion's products to Materials Handling, Inc., the cart fabrication concern.

18. We have based our discussion almost entirely upon the evidence claimed by Dillon to establish a practice of exclusive dealing and have found that evidence insufficient. To further substantiate our conclusion, we need only point to the testimony of Dillon's own employees. Jim Bussard, a "territory manager" for Dillon, was responsible for Dillon's promotion and sales. He testified that he never had heard of any restrictions on the types of products Dillon was permitted to sell after becoming an Albion distributor. James D. Brock, a Dillon salesman, also testified that he knew of no such restriction and that he felt free to sell whatever product he needed to sell in order to meet the customers' needs. Finally, Dillon's purchasing agent, Charles S. Rhoads, testified as follows:

   [W]e had a number of customers that [were] strictly Colson-oriented. This happened back when we had nothing else to offer them but Colson and *if they asked for Colson we gave them Colson.* And we bought where we could get delivery. And so *if Colson wheels were slow we bought Albion . . . or . . . . Jakes or . . . . R & K, whoever we could get them from.*" [emphasis added].

jury's conclusion that Albion's alleged exclusivity requirement bound all of its distributors. During the period in question, Albion had from 35 to 41 stocking distributors nationwide. Dillon attempted to make its case by introducing correspondence with Albion distributors from as far back as 1951. The vast majority of these letters, which concerned the establishment and maintenance of various distributors, made no mention of an exclusive dealing requirement. Four of the letters, however, contained a similar phrase which in essence said that Albion "assumed" the distributor would not sell competitive goods for the duration of the distributorship agreements. These letters were dated November 1, 1954, August 26, 1954, June 30, 1955, and May 8, 1964. Although the most recent letter was written eight years before Dillon became a distributor, Dillon attempts to propel them into the future by pointing out that both Karmalski and Dobbins testified that they did not change any of Albion's basic sales policies after becoming president. The weakness of Dillon's position should be obvious—the letters alone fall far short of establishing a "policy" of any sort in existence before 1971. Indeed, Richard Dobbins, who became Albion's president one month after Dillon became a distributor, testified that he knew of no such restrictive policy in effect when he took over and that no such policy had been in force during his tenure.[19]

---

**19.** In fact, Dobbins testified that "[m]ost of our distributors handle our competitor's and many, many of them are competitive." Dillon was unable to produce any other distributors to refute this testimony or to present any evidence that Albion had ever terminated a distributor for selling competitive goods.

Dillon's inability to show that Albion's distributors were bound by any sort of exclusive dealing agreement, of course, makes clear the correctness of the district court's conclusion concerning the effect-on-competition prerequisite. The basic evil meant to be curbed by section 3 is the foreclosure of the market to competitors of the seller. Dillon produced no evidence, either directly or indirectly, that Albion's competitors were precluded or discouraged from entering the market because of any practice or policy of Albion.

On the record before us, we need not resolve one of the basic disputes in this litigation— whether Dillon's showing that Albion enjoyed from 8 to 12 percent of the nationwide caster market and sold from $3 to $8 million worth of casters annually suffices to show a "substantial lessening of competition." The parties in this case, the courts and commentators have debated whether the "quantitative substantiality" test announced by the Supreme Court in *Standard Oil v. United States*, 337 U.S. 293, 299–315, 69 S.Ct. 1051, 1055, 93 L.Ed. 1371 (1949) (test is whether competition may be foreclosed "in a substantial share of the line of commerce affected"), was in any way changed by the apparently broader inquiry outlined in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1960):

To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.

*Id.* at 329, 81 S.Ct. at 629. The Supreme Court has not attempted to reconcile the approaches, and we need not attempt to do so here, since it is plain that Dillon failed to satisfy the less exacting inquiry made in *Standard Oil*.

In *Standard Oil* the government, which complained of contracts requiring dealers to purchase gasoline and TBA exclusively from the defendant, showed that the challenged contracts bound some 6,000 service stations in the geographic market involved. 337 U.S. at 295, 69 S.Ct. 1051. Similar showings were made in other Clayton Act cases ultimately decided by the Court. *E. g., Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 461–62, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *see International Salt Co. v. United States*, 332 U.S. 392, 394–95, 68 S.Ct. 12, 92 L.Ed. 20 (1947); *International Business Machines Corp. v. United States*, 298 U.S. 131, 132–36, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 454–57, 42 S.Ct. 363, 66 L.Ed. 708 (1922). Dillon, on the other hand, proved Albion's percentage market share but did not show what portion, if any, of the market had been pre-empted by an exclusivity arrangement with the distributors. We do not mean to intimate that a seller cannot violate the Clayton Act by entering an exclusive dealing contract with a single buyer, *see Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922), or that Dillon was bound to prove such an arrangement with each and every one of Albion's distributors. However, proof of percentage market share and dollar volume alone,

█ In light of our holding that there was insufficient evidence for a reasonable jury to conclude that the sale of Albion casters to Dillon was based on a "condition, agreement, or understanding" of exclusivity, Dillon's Clayton Act claim is reduced, at best, to a termination of its distributorship in part because of its promotion of the Colson line. It is well settled, however, that in the absence of any forbidden agreement a seller may unilaterally refuse to do business with a buyer without running afoul of the antitrust laws. *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).[20] As this court held in *Nelson Radio & Supply Co. v. Motorola*, 200 F.2d 911 (5th Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953):

> Section 3 of the Clayton Act, by its express terms, covers only leases, sales or contracts actually made on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods of a competitor of the lessor or seller. There is nothing whatever in the Act to suggest that it covers a situation where the manufacturer refuses to make a sale or enter into a contract, and it has been stated time and again that a manufacturer has the unquestioned right to refuse to deal with anyone for reasons sufficient to himself. . . .
> There is a real difference between the act of refusing to deal and the execution of a contract which prevents a person from dealing with another.

*Id.* at 915–16 (footnote and citations omitted); *accord Timken Roller Bearing Co. v.*

*FTC*, 299 F.2d 839, 842 (6th Cir.), *cert. denied*, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 (1962); *Associated Beverages Co. v. P. Ballantine & Sons*, 287 F.2d 261, 265 (5th Cir. 1961); *McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332, 337–39 (4th Cir. 1959); *Leo J. Meyberg Co. v. Eureka Williams Co.*, 215 F.2d 100, 100 (9th Cir.) (per curiam), *cert. denied*, 348 U.S. 875, 75 S.Ct. 113, 99 L.Ed. 689 (1954); *Elliott & Frantz, Inc. v. Raygo, Inc.*, 379 F.Supp. 498, 501–502 (E.D.Pa.1974). *Cf. Scanlan v. Anheuser-Busch, Inc.*, 388 F.2d 918, 921 (9th Cir.), *cert. denied*, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968) (unilateral change of distributors without effect on availability of competing goods not violation of antitrust laws). The thrust of these cases is clear—a refusal to deal is by definition a refusal to enter into the requisite sale or lease.

In summary, we conclude that there was wholly insufficient evidence to support the jury's finding that Albion violated section 3 of the Clayton Act. We see no reason to discuss Dillon's other arguments on appeal. Accordingly, the judgment of the district court is AFFIRMED.

█

without any proof of the breadth of exclusive dealing, is inadequate.

**20.** The *Colgate* doctrine has been re-examined by the Supreme Court on numerous occasions. *See Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 38–49, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 722–23, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 451–54, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *Frey & Son, Inc. v. Cudahy Packing Co.*, 256 U.S. 208, 209–11, 41 S.Ct. 451, 65 L.Ed. 892 (1921); *United States v. A. Schrader's Son, Inc.*, 252 U.S. 85, 96–100, 40 S.Ct. 251, 64 L.Ed. 471 (1920). Although the basic principle has been narrowed considerably in recent history, we find nothing in the record to indicate that Albion did not successfully traverse the narrow path clearly by the Court.