**BLACK GOLD, LTD., a Colorado corporation, Plaintiff-Appellee and Cross-Appellant,**

v.

**ROCKWOOL INDUSTRIES, INC., a Delaware corporation, Defendant-Appellant and Cross-Appellee.**

**Nos. 80–2098, 80–2143, 82–1176 and 82–1177.**

United States Court of Appeals, Tenth Circuit.

March 9, 1984.

---

See also, D.C., 529 F.Supp. 272.

Kenneth R. Bennington of Brownstein Hyatt Farber & Madden, Denver, Colo. (John W. Madden III, Thomas D. Smart, Jr. of Smart, DeFurio & Brooks & Eklund, Denver, Colo., with him on brief), for Black Gold, Ltd.

John G. Wigmore of Lawler, Felix & Hall, Los Angeles, Cal. (Richard C. Neal, Los Angeles, Cal., Jeffrey L. Smith and John P. Congdon of Cohen, Brame, Smith & Krendl, Denver, Colo., with him on brief), for Rockwool Industries, Inc.

Before DOYLE, McKAY and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Black Gold, Ltd. (Black Gold) brought this private antitrust action against Rockwool Industries, Inc. (Rockwool) for damages resulting from alleged violations of section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), and section 3 of the Clayton Act, 15 U.S.C. § 14. After all the evidence had been presented to a jury, the district court directed a verdict for Rockwool on claims alleging an illegal tying arrangement and a refusal to deal, and sent the remaining two claims based on price discrimination to the jury. The jury returned a general verdict in favor of Black Gold. Both parties have appealed. We affirm in part, reverse in part, and remand for a new trial.

## I.

### BACKGROUND

The stipulated facts giving rise to this controversy are as follows. Black Gold is in the business of installing insulation in both new construction and existing structures. Rockwool manufactures, sells, and distributes an insulating material generically known as rockwool for use in both new and existing buildings. Williams Insulation Company (Williams), a competitor of Black Gold, also installs insulation in new and existing buildings.

Both Black Gold and Williams bought insulating material from Rockwool during the relevant time. This material comes in two forms, blown wool and batts. Blown

wool is loose and is blown into the attics of existing buildings. Batts are thick strips or pads wrapped in paper or foil and are used in new construction.

Between September 1975 and February 1979, Public Service Company of Colorado (PSC), a public utility supplying gas and electricity to Colorado consumers, operated a program to provide its residential customers an opportunity to upgrade their home insulation. Under the program, customers could choose to have either rockwool, fiberglass, or cellulose insulation retrofitted into their homes.

PSC maintained lists of installers approved to apply each type of insulation, and offered retrofitting jobs in the Denver metropolitan area to installers on a rotating basis. Installers could only use types and brands of insulation specifically approved by PSC, and could not substitute another type of insulation for that specified by the homeowner. Prices for the jobs were set by PSC. Although the price varied according to the type of insulation installed, all installers of the same type of material were paid at the same rate.

The only brand of rockwool insulating material approved for use in the PSC program was that manufactured by Rockwool. Both Black Gold and Williams were qualified to install rockwool in the PSC program and both bought blown wool from Rockwool to use in the program. Rockwool stipulated that during the PSC program it regularly sold both blown wool and batts to Williams at a lower price than it offered to Black Gold.

At trial, Black Gold offered evidence tending to support the following allegations. Rockwool was unable to sell as great a quantity of batts insulation as it wished because of a slump in new construction that occurred during the time the PSC program was in effect. Because the PSC program involved the insulation of older homes rather than new construction, batts were not used in the program. By con-

trast, Rockwool's blown wool was selling rapidly due to the demand created by the PSC program. Black Gold alleges that Rockwool attempted to coerce Black Gold to purchase batts by withholding timely delivery of blown wool which Black Gold needed to participate in the PSC program. Except for a small test shipment, however, Black Gold refused to buy rockwool batts from Rockwool, allegedly because Black Gold believed fiberglass batts were a superior product and because Rockwool would not sell its batts to Black Gold at as low a price as it sold them to Black Gold's competitor Williams. Rockwool ultimately terminated its sales of blown wool to Black Gold, although it continued sales to Williams and another competing installer, both of whom regularly purchased batts. Black Gold testified that it was forced to refuse many jobs in the PSC program because it could not obtain blown wool from Rockwool. Virtually all of the blown wool that Black Gold had been able to obtain from Rockwool was used in the PSC program.

In the proceedings below, Black Gold claimed that Rockwool practiced price discrimination in violation of section 2(a) [1] by selling blown wool to Williams at a lower price than it sold the material to Black Gold, by refusing to sell batts to Black Gold at as low a price as it gave Williams, by failing to make timely deliveries of blown wool, and by refusing to sell blown wool to Black Gold. Black Gold also contended that Rockwool and Williams conspired to give Williams a competitive advantage by this price discrimination in violation of section 1 of the Sherman Act. Black Gold further claimed that Rockwool violated section 3 of the Clayton Act by tying the sale of blown wool to the sale of batts. Finally, Black Gold alleged that Rockwool's refusal to deal with Black Gold was in furtherance of the tying arrangement and amounted to a conspiracy in restraint of trade in violation of section 1 of the Sherman Act.

---

1. The Robinson-Patman Act, 49 Stat. 1526, 15 U.S.C. §§ 13, 13a, 13b, 21a (1982), amended section 2(a) of the Clayton Act. The provision will be referred to in this opinion simply as section 2(a).

The trial court directed a verdict for Rockwool on the alleged tying arrangement because the court found no evidence of any anticompetitive effect. The court also directed a verdict for Rockwool on the claimed refusal to deal, finding no evidence of a contract, combination, or conspiracy. The two claims based on price discrimination went to the jury, which returned a general verdict for Black Gold in the amount of $93,350. The verdict was trebled to $280,050.

## II.

### THE PRICE DISCRIMINATION CLAIMS.

#### A.  The Robinson-Patman Claim

As noted above, the alleged illegal conduct under the Robinson-Patman Act was one of two price discrimination claims upon which the jury returned a general verdict in favor of Black Gold. On appeal, Rockwool contends that its lower price to Williams did not constitute a violation of the Act because, under the method by which the PSC program was administered, the price difference did not tend to lessen competition as required by the Act. In addition, Rockwool contends that the court improperly instructed the jury that price discrimination under the Act can include discrimination with respect to timely deliveries and with respect to the amounts sold. Finally, Rockwool alleges that the court lacked jurisdiction under the Robinson-Patman Act for those sales which were entirely intrastate.[2]

Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, provides in relevant part:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them."

15 U.S.C. § 13(a).

The primary purpose of the Act is to protect the competitive process, not individual competitors. *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 547–48 (9th Cir.1983); *Atlas Building Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 954 (10th Cir.1959); 4 J. von Kalinowski, Antitrust Laws and Trade Regulation § 28.03 (1983). Thus, to establish a violation of this provision, Black Gold must show that the price differential in this case had the requisite potential to substantially affect competition. *See Foremost Pro Color*, 703 F.2d at 547–48; *Williams Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1040 (9th Cir.1981) *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 58, 74 L.Ed.2d 61 (1982); *M.C. Manufacturing Co. v. Texas Foundries*,

---

**2.** Rockwool also contends that the district court improperly instructed the jury on Rockwool's claim that its lower prices to Williams were made in good faith to meet competition within the meaning of section 2(b) of the Clayton Act, as amended. Rockwool alternatively argues that the court should have sustained this defense as a matter of law.

Rockwool further contends that Black Gold failed to prove the fact of injury from the alleged discrimination so as to be entitled to damages under section 4 of the Clayton Act. Rockwool claims that the district court's instructions on calculating damages in effect allowed Black Gold to recover without making the requisite showing. Rockwool also argues that even if the fact of injury had been shown, the amount of damages awarded was speculative and without support in the record. Given our disposition of the price discrimination claims, we do not address these contentions on appeal.

*Inc.*, 517 F.2d 1059, 1066 (5th Cir.1975), *cert. denied*, 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976); *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir.1964); *see generally* 4 J. von Kalinowski, *supra* § 23.02[2] (1982).

"Even if the sales at different prices are contemporaneous, involve goods of like grade and quality, the price distinction is not justified by good business cause, and it causes injury to the disadvantaged purchaser, recovery under the Act is precluded absent proof that the price variance detrimentally affected competition."

*M.C. Manufacturing Co.*, 517 F.2d at 1066.

■ Given the unusual and uncontroverted facts in this case, we must conclude that the price differential on blown wool purchased for use in the PSC program could not have adversely affected competition *within the program.* The price for installing each type of insulation was set by PSC and was uniformly applied to all installers. Moreover, the jobs for installing each type of insulation were equitably offered to listed installers on a rotating basis. Under this scheme, Williams could not divert sales from Black Gold by lowering its price as a result of its favored position.

Black Gold argues on appeal that an effect on competition may be shown even if the favored purchaser does not lower the resale price of the goods. In addressing this argument, it is important to distinguish between injury to competition and injury to a competitor. The courts have generally been willing under some circumstances to infer injury to competition even when resale prices between favored and disfavored purchasers remain the same. *See* L. Sullivan, Handbook of the Law of Antitrust § 224 (1977); 1 ABA Antitrust Section, Monograph No. 4, The Robinson-Patman Act: Policy and Law 99 (1980).

Such an inference may be supportable because "[t]o the extent a disfavored purchaser must pay more for its goods than its competitors, it is less able to compete. It has fewer funds available with which to advertise, make capital expenditures, and the like." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 564 n. 4, 101 S.Ct. 1923, 1929 n. 4, 68 L.Ed.2d 442 (1981). In the usual competitive market, when a competitor is thus less able to compete, competition itself may often be affected.

In the case before us, however, although Black Gold may have realized a lower profit margin from its PSC jobs than did its competitors, there is no evidence showing that Black Gold's lower profits had any impact upon its ability to compete in the PSC program. Black Gold's president and chief operating executive officer testified that Black Gold incurred no sales costs, advertising costs, or collection expenses in connection with the PSC program, and that the PSC jobs were "quite a lot more profitable" than outside jobs. Rec., vol. IX, at 6. We conclude that although the price differential may have resulted in lower profits from the PSC jobs for Black Gold than for Williams, these lower profits could not have produced an effect on competition within the program.[3]

■ Both before the trial court and on appeal Black Gold has asserted that the requisite competitive injury can be established by Rockwool's failure to make timely deliveries of the blown wool ordered by Black Gold for the PSC jobs and from Rockwool's ultimate refusal to fill Black Gold's blown wool orders. Black Gold presented evidence at trial that it had to refuse a substantial number of PSC jobs because it was unable to obtain blown wool, and that these jobs were distributed to its competitors on a rotating basis. In-

---

3. We recognize that the lower profits obtained by Black Gold *within* the PSC program might have detrimentally affected its ability to compete *outside* the program. However, Black Gold did not raise this argument on appeal.

Black Gold also argues that the discriminatory pricing had an impact on the price set by PSC for installing all rockwool insulation in the program and cites evidence in support of this allegation. Given our analysis of the particular market dynamics in this case, we conclude that this fact, even if true, is irrelevant to our consideration of competitive impact.

deed Black Gold has consistently claimed that the primary cause of its injury was not the price it paid for the material it did receive, but rather its inability to obtain timely and sufficient quantities of blown wool for the program at any price.

The district court apparently agreed that these injuries constitute price discrimination under the Act and accordingly instructed the jury as follows:

" 'Price discrimination,' as that term is used in the statute, simply means that a seller of a commodity gives to one of its purchasers an advantage in price, terms and conditions not accorded or given to other purchasers. Thus, the term 'price discrimination' includes more than simply discrimination as to the unit price of the commodity involved. The advantage may be given by lower prices, discounts or *other advantages, such as timely delivery given to the favored purchaser and not given to the others.*"

Rec., vol. XV, at 155 (emphasis added). "You are instructed that it is sufficient if Black Gold and Williams engaged in forms of competition, other than simply price competition. In addition to price competition, you may consider whether Black Gold and Williams engaged in other forms of *competition based on their ability to have the needed insulation on hand to install when required,* or based on their ability to provide the services and quality of services demanded by their customers."

*Id.* at 157 (emphasis added). Rockwool argues that the untimely deliveries and refusal to deal in this case are not price discriminations within the meaning of the Robinson-Patman Act, and that the trial court's instructions on these issues were erroneous. We agree.

Section 2(a) is directed to price discrimination and nothing more. Price is to be determined by reference to the invoice sub-

mitted to the buyer, and "any discounts, offsets, or allowances not reflected in the invoice price." 4 J. von Kalinowski, *supra* § 27.03[2]. Some delivery practices may constitute a violation of section 2(a) because they directly or indirectly affect the price paid for the goods. *See, e.g., Corn Products Refining Co. v. FTC*, 324 U.S. 726, 740, 65 S.Ct. 961, 968, 89 L.Ed. 1320 (1945); 4 J. von Kalinowski, *supra* § 27.-03[3], § 27.03[4] n. 45 and text accompanying. However, a violation of section 2(a) only arises when "discriminations in the terms of sale [operate] to permit the favored customers to purchase at a lower price than other customers, so that their only practical effect [is] to establish discriminations in price, precisely the evil at which the statute was aimed." *Corn Products*, 324 U.S. at 740, 65 S.Ct. at 968. "[T]he act is *inapplicable* to 'terms of sale except as they amount in effect to the indirect discriminations in price within the meaning of the remainder of subsection (a).' " *Id.* (quoting H.R.Rep. No. 2951, 74th Cong., 2d Sess. 5) (emphasis added).

In this case Black Gold does not claim that the untimely deliveries had any effect upon the price it paid Rockwool for blown wool. Accordingly, Rockwool did not violate section 2(a) [4] by discriminating in its deliveries to Black Gold. *See, Howell Industries, Inc. v. Sharon Steel Corp.*, 532 F.Supp. 400, 405–06 (E.D.Mich.1981).

Black Gold's claim that Rockwool violated the Act by refusing to supply Black Gold with as much blown wool as it required for the PSC program must also fail. This claim in essence alleges a refusal to deal, conduct which does not fall within the proscription of section 2(a). *See L & L Oil Co. v. Murphy Oil Corp.*, 674 F.2d 1113, 1120 (5th Cir.1982); *Naifeh v. Ronson Art Metal Works*, 218 F.2d 202, 206 (10th Cir.1954); 4 J. von Kalinowski, *supra* § 24.03[2][c]. "It is well established that in order to allege a violation of § 2(a) one

---

**4.** The circuits are split on whether discriminatory deliveries are within the proscription of section 2(e) of the Clayton Act, as amended by the Robinson-Patman Act. *See Foremost Pro Color, Inc. v. Eastman Kodak Co.,* 703 F.2d 534, 546

(9th Cir.1983). However, Black Gold has not claimed that the untimely deliveries in this case violated that section of the Act. The scope of section 2(e) is thus not before us and we do not address it.

seller must have made at least two actual sales to two actual buyers at different prices." *L & L Oil Co.*, 674 F.2d at 1120. When a seller refuses to sell to one buyer, the requisite price discrimination between two buyers is lacking. *Id.* Although such a refusal may be actionable under other antitrust provisions, see discussion infra part IV, such conduct is outside the scope of section 2(a).

■ We conclude that the only actions by Rockwool cognizable under section 2(a) are those discriminatory sales, if any, of blown wool and batts actually made to Black Gold which had the requisite effect on competition *outside the PSC program.* Because the PSC program constituted such a large part of Black Gold's installation of blown wool, it is impossible to affirm the general jury verdict in Black Gold's favor. However, because the case must be retried, see part IV infra, Black Gold should have the opportunity to establish any injury occurring outside the PSC program. We therefore turn to Rockwool's argument that the court lacks jurisdiction over any Robinson-Patman claims that did not involve interstate sales.

■ Section 2(a) requires that one of the alleged discriminatory purchases be "in commerce." " '[A]t least one of the two transactions which, when compared, generate a discrimination [must cross] a state line.' " *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974) (quoting *Hiram Walker, Inc. v. A & S Tropical, Inc.*, 407 F.2d 4, 9 (5th Cir.1969)). "The 'in commerce' requirement, moreover, delimits both the universe of 'persons' who are subject to the Act and the type of transactions that can constitute a violation thereof. Not the alleged violator, merely, but the discrimination sought to be charged must also involve a transaction 'in commerce.' " *S & M Materials Co. v. Southern Stone Co.*, 612 F.2d 198, 200 (5th Cir.), *cert. denied*, 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980). In addition, the sales under comparison must be reasonably contemporaneous in that they "must (1) have been en-

tered into within a reasonably short time period and (2) contemplate reasonably simultaneous delivery of the goods involved in the transaction." 4 J. von Kalinowski, *supra* § 24.03[3]; *see also Castlegate, Inc. v. National Tea Co.*, 34 F.R.D. 221, 229 (D.Colo.1963). It appears from the stipulated facts in this case that the only sales of insulation crossing a state line involved material from Missouri sold to Black Gold between November 26, 1975 and February 2, 1976. Those sales alone may be used in comparison with other reasonably contemporaneous sales to determine the damages to which Black Gold may be entitled under its section 2(a) price discrimination claim. *See* 4 J. von Kalinowski, *supra* § 26.02[2]. Accordingly, the court on remand should consider the Act's "in commerce" requirement in light of the amount of interstate sales revealed in this case.

### B. The Sherman 1 Claim

■ Black Gold also claimed that Rockwool violated Sherman 1 by entering into a price discrimination conspiracy. However, discriminatory sales that are legal under the Robinson-Patman Act because they do not tend to substantially lessen competition are likewise legal under Sherman 1. "[N]o difference in the criteria for illegality or the mode of analysis follows from the difference between the 'unreasonable' formula of the Sherman Act and the 'substantial lessening of competition' formula of the Clayton Act." 2 P. Areeda and D. Turner, Antitrust Law ¶ 304a (1978). Accordingly, our determination that the discriminatory sales *within the PSC program* did not violate the Robinson-Patman Act for lack of competitive effect is equally applicable to the alleged Sherman 1 violation.

■ However, there may remain a Sherman 1 price discrimination claim for sales affecting competition outside the PSC program. Although the criteria for illegality in terms of competitive effect are the same under the Robinson-Patman Act and Sherman 1, the commerce requirements are different. As discussed above, the Robinson-

Patman Act requires that one of the discriminatory sales cross a state line. Under the Sherman Act, the alleged conspiracy need only affect interstate commerce. *See generally Crane v. Intermountain Health Care, Inc.*, 637 F.2d 715 (10th Cir.1981) (en banc).

On remand, the district court must determine whether viable price discrimination claims exist pursuant to either the Robinson-Patman Act or Sherman 1 under the standards discussed above.

## III.

### THE TYING ARRANGEMENT CLAIM

■ The district court directed a verdict for Rockwool on the claim that Rockwool tied the sale of blown wool to the sale of batts in violation of section 3 of the Clayton Act. In so doing the court found no evidence of the requisite anticompetitive effect.

"A tying arrangement is an agreement by a party to sell one product only on the condition that the buyer also purchase a different or 'tied' product." *Foremost Pro Color*, 703 F.2d at 540. A tying arrangement is unlawful under section 3 of the Clayton Act where its effect "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. This standard is met if 1) a substantial volume of commerce is foreclosed in the market for the tied product, or 2) the seller possesses economic power in the tying product *and* a not insubstantial volume of commerce is foreclosed in the market for the tied product.[5] 3 J.

von Kalinowski, *supra* § 14.03[3]. Under the second test, a seller has the requisite market power in the tying product if that product is "unique or desirable to customers." *Id.; United States v. Loew's, Inc.*, 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962); *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1215–16 (9th Cir.1977). The amount of commerce affected in the tied product is measured in terms of dollar volume. 3 J. von Kalinowski, *supra* § 14.-03[3]. "The relevant figure is the total volume of sales tied and not the portion of sales allocable to the plaintiff." *Moore*, 550 F.2d at 1216; *Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969).

In this case, the trial judge stated: "I do not believe that either test is met, nor can I see any anticompetitive effect with Rockwool's competitors from any of the evidence that has been presented here." Rec., vol. XV, at 43–44. We need not determine whether the court properly applied the standards discussed above when it directed a verdict for Rockwool on this issue[6] because we conclude that this claim should not have gone to the jury for another reason.

Tying arrangements injure competitors of the seller of the tied product because these competitors are foreclosed from sales as a result of the ties. *Fortner*, 394 U.S. at 498–99, 89 S.Ct. at 1256–57; *Moore*, 550 F.2d at 1212 n. 4. Tying also has an anticompetitive impact on buyers of the tied product, because their freedom of choice

---

**5.** Under current law, this showing is sufficient to establish the illegality of a tying arrangement under either section 3 of the Clayton Act or section 1 of the Sherman Act. *See Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1214 (9th Cir.1977); L. Sullivan, *supra* § 152 at 434.

**6.** We note that a directed verdict is only proper when, construing the evidence and the inferences therefrom in the light most favorable to the nonmoving party, "all the inferences to be drawn from the evidence are so patently in favor of the moving party that reasonable men could not differ as to the conclusions to be drawn therefrom." *Hidalgo Properties, Inc. v. Wachovia Mortgage Co.*, 617 F.2d 196, 198 (10th

Cir.1980); *see also Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). Under this standard, we do not believe the directed verdict could have been sustained on the ground adopted by the trial court. Rockwool had sufficient market power in the tying product, blown wool, because this product was the only one approved for use in the PSC program. Thus the tying product was both unique and desirable. Moreover, construing the evidence and inferences most favorably to Black Gold, the dollar volume of rockwool batts tied to the sale of blown wool cannot be considered de minimis.

among products competing with the tied product is foreclosed. *Fortner*, 394 U.S. at 499, 89 S.Ct. at 1256. In this case, Black Gold refused to purchase batts from Rockwool except for a $3919.00 test order. Since Black Gold was neither a buyer nor a competing seller, it did not suffer the competitive injury that section 3 was designed to prevent.

As pointed out above, Black Gold alleges that the primary cause of its injury was Rockwool's refusal to sell blown wool unless Black Gold also bought batts. However, a refusal to deal does not fit within the scope of section 3 of the Clayton Act.

> "[E]ven though the refusal to deal with plaintiff is evidence that [sales to other buyers] are upon the condition which violates Section 3, it is these sales, not the refusal to sell to plaintiff, which constitute the violation; and it is the refusal, not the unlawful sales, which causes plaintiff's injury."

L. Sullivan, *supra* § 168 at 488 (footnote omitted). Although a refusal to deal under these circumstances may violate section 1 of the Sherman Act, see part IV infra, courts have been unwilling to extend section 3 of the Clayton Act to a mere refusal to deal, in the absence of an actual sale or lease to the plaintiff. *See Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1388–89 (9th Cir.1981); *Dillon Materials, Inc. v. Albion Industries*, 567 F.2d 1299, 1306 (5th Cir.1978); *McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332, 337–38 (4th Cir.1959). *See also* 3 J. von Kalinowski, *supra* § 12.-05(2) (citing cases). We also decline to do so. Accordingly, the directed verdict on section 3 of the Clayton Act is affirmed.

### IV.

### THE CLAIMED REFUSAL TO DEAL

■ The district court directed a verdict for Rockwool on the claim that Rockwool's refusal to sell Black Gold blown wool violated section 1 of the Sherman Act.[7] The court based its decision on its finding that there was no evidence of a contract, combination, or conspiracy in restraint of trade. Rec., vol. XV, at 44. In reviewing this determination, we must view the evidence most favorably to Black Gold and "give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962).

Under section 1 of the Sherman Act, only those restraints of trade in the form of a contract, combination, or conspiracy are unlawful. Determining when business conduct provides the requisite combination or conspiracy in the context of an alleged unlawful refusal to deal has proven troublesome. In *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), the Supreme Court established a seller's right to unilaterally refuse to deal with whomever it wishes. Under the *Colgate* doctrine such a unilateral refusal, without more, does not violate Sherman 1 because no combination or conspiracy is involved. However, in cases coming after the articulation of the *Colgate* doctrine, the courts have narrowed the business conduct which *Colgate* protects, while broadening those practices deemed to constitute a conspiracy or combination within the meaning of Sherman 1. *See generally*, P. Areeda, Antitrust Analysis ¶¶ 522–527 (3d ed. 1981); L. Sullivan, *supra*, § 139; 2 J. von Kalinowski, *supra* § 6C.02[1].

Thus in *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Court found that the *Colgate* doctrine did not protect a scheme whereby Parke Davis announced its continuing policy to sell only to wholesalers and retailers who maintained the retail prices specified by Parke Davis, and then actively sought to enforce compliance with its policy.

---

**7.** Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." 15 U.S.C. § 1.

"The program upon which Parke Davis embarked to promote general compliance with its suggested resale prices plainly exceeded the limitations of the *Colgate* doctrine and under [*Federal Trade Commission v.*] *Beech-Nut* [*Packing Co*]., [257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922)] and [*States v.*] *Bausch & Lomb* [*Optical Co*]., [321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944)] effected arrangements which violated the Sherman Act. Parke Davis did not content itself with announcing its policy regarding retail prices and following this with a simple refusal to have business relations with any retailers who disregarded that policy. Instead Parke Davis used the refusal to deal with the wholesalers in order to elicit their willingness to deny Parke Davis products to retailers and thereby help gain the retailers' adherence to its suggested minimum retail prices. The retailers who disregarded the price policy were promptly cut off when Parke Davis supplied the wholesalers with their names. The large retailer who said he would 'abide' by the price policy, the multi-unit Peoples Drug chain, was not cut off. In thus involving the wholesalers to stop the flow of Parke Davis products to the retailers, thereby inducing retailers' adherence to its suggested retail prices, Parke Davis created a combination with the retailers and the wholesalers to maintain retail prices and violated the Sherman Act."

*Id.* at 45, 80 S.Ct. at 512 (footnotes omitted). It is apparent from *Parke Davis* that an unlawful combination within the meaning of the Sherman Act exists "if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy." *Id.* at 43, 80 S.Ct. at 511.

Subsequent to *Parke Davis*, the Supreme Court made it clear that a plaintiff who contends a seller has unlawfully used a refusal to deal as a means of enforcing an anticompetitive practice (such as tying or price-fixing) may establish the requisite combination or conspiracy in either of two ways: by showing that he himself unwillingly complied with the practice, or by showing that although he refused to acquiesce, other buyers agreed to the arrangement under threat of termination. *See Perma Life Mufflers v. International Parts Corp.*, 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968); *Albrecht v. The Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 872 n. 6, 19 L.Ed.2d 998 (1968). *See also, Yentsch v. Texaco, Inc.*, 630 F.2d 46, 51–52 (2d Cir.1980); *Arnott v. American Oil Co.*, 609 F.2d 873, 885 (8th Cir.1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).

Black Gold itself refused to buy goods under the alleged unlawful tying arrangement and cannot therefore base the requisite combination or conspiracy on any agreement it had with Rockwool. Under the second method set out above, however, the record contains sufficient evidence supporting the inference of a combination or conspiracy between Rockwool and other buyers to withstand a motion for directed verdict. We note evidence that Rockwool communicated its desire to its customers that they purchase both blown wool and batts, and that Rockwool continued to sell blown wool to Williams and another competitor, both of whom bought batts. However, blown wool sales to Black Gold, which refused to buy batts from Rockwool, were terminated. The record also contains evidence allowing the inference that Rockwool participated in an attempt to help Williams reacquire a former customer who had transferred its account to Black Gold. Black Gold did not use wool batts with this customer although Williams did.

We conclude that, although a combination has not been established as a matter of law, the evidence is sufficient to send the issue to the jury. Under *Parke Davis* and its progeny, if Rockwool used the refusal to deal with Black Gold to induce adherence by other customers to a tying arrangement that violates the antitrust laws, Rockwool would be liable under section 1 of the Sherman Act for unlawfully combining to restrain trade. Therefore, the di-

rected verdict on Black Gold's claim of unlawful refusal to deal under Sherman 1 is reversed.

## V.

### CONCLUSION

As noted above, the jury returned a general verdict for Black Gold on the two price discrimination claims. Because we have concluded that these claims were not properly presented to the jury, this verdict must be reversed. We affirm the directed verdict on the alleged tying arrangement, and reverse the directed verdict on the alleged refusal to deal. This action is remanded for further proceedings in light of this opinion.