Alan B. MORRISON, Appellant,

v.

NISSAN MOTOR CO., LTD.; Nissan Motor Corporation in U. S. A., S. & R. Inc., d/b/a VOB Datsun Sales, Appellees.

No. 78–1384.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1979.

Decided June 25, 1979.

William B. Schultz, Washington, D. C., for appellant.

Nolan E. Clark (Timothy S. Hardy, Kirkland & Ellis, Washington, D. C., on brief), for appellees.

Before BUTZNER, RUSSELL and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This is an antitrust case.[1] The defendants are Nissan Motor Co., Ltd., a Japanese corporation, Nissan Motor Corporation, a California corporation, a subsidiary of Nissan Motor Co., Ltd., and VOB Datsun, an automobile dealer in Rockville, Maryland.[2] Nissan Motor Co., Ltd. is the manufacturer and Nissan Motor Corporation is the distributor in the United States of the Datsun automobile (the two are hereafter referred to collectively as Nissan). VOB Datsun (described in the complaint as VOB Auto Sales) is a franchised dealer of Datsun cars. The plaintiff is the owner of a Datsun car which he has often had repaired at VOB Datsun's repair department. His claim of an antitrust violation relates to the charges made him for these repairs. It is his contention that these charges were made in conformity with a schedule of time charges prescribed in a Datsun Flat Rate Manual distributed by Nissan to be followed by its franchised dealers in their charges for any repairs, warranty or non-warranty, on a Datsun car. This practice constituted, under plaintiff's contention, a violation of the antitrust laws, for which he seeks damages individually, and as a class representative, an injunction against further use of the allegedly illegal schedule.[3]

By way of answer to the complaint, the defendant Nissan admitted the distribution of the Datsun Flat Rate Schedule or Manual, as alleged by the plaintiff. It alleged that, so far as the Manual fixed any mandatory time schedules for work, such schedules related only to warranty work, for which Nissan was *solely* responsible. This implied that the schedules were intended to

---

1. 15 U.S.C. § 1, *et seq.*, Sherman Antitrust Act.

2. There were originally a number of other franchised dealers listed as defendants. The action as against them, however, was dismissed. We

have accordingly treated VOB Datsun as the sole franchised dealer-defendant.

3. Class certification was denied in an order not involved in this appeal.

be merely advisory for non-warranty repairs such as those performed for the plaintiff, payment for which the plaintiff was *solely* responsible. In short, Nissan contended that the Manual set up mandatory time charges for warranty work, but was purely advisory, for the convenience of the dealers, so far as non-warranty work was concerned. It denied specifically that it had ever either singly or in concert with its franchised dealers established any mandatory time schedule to be used by such dealers in their charges for non-warranty repairs. It, as well as Datsun, accordingly denied any violation of the Sherman Act.

After joinder of issue, the parties proceeded to engage in an exchange of interrogatories and conducted some discovery depositions. Following the receipt by the court of answers to most of the interrogatories[4] and depositions, Nissan and Datsun moved for summary judgments, supporting their motions both with the record as it then existed and with a number of affidavits. The legal basis for their motions was that there was no genuine issue of fact in the case and that, giving full effect to such undisputed facts, it was clear as a matter of law that there had been no violation of the Sherman Antitrust Act by any defendant. The district court granted the motions and dismissed the action. This appeal by the plaintiff challenges the grant of summary judgment.[5]

Summary judgment under Rule 56, Fed.R.Civ.P. should be granted only where it is perfectly clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts. *United States v. Diebold, Inc.* (1962) 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176; *Fli-Back Co., Inc. v. Philadelphia Mfrs. Mut. Ins. Co.* (4th Cir. 1974) 502 F.2d 214, 218; *Stevens v. Howard D. Johnson Co.* (4th Cir. 1950) 181 F.2d 390, 394; *Handi Inv. Co. v. Mobile Oil Corp.* (9th Cir. 1977) 550 F.2d 543, 546–47. Accordingly, even though there may be no dispute about the basic facts, still summary judgment will be inappropriate if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts. *Winters v. Highlands Ins. Co.* (5th Cir. 1978) 569 F.2d 297, 299; *Exnicious v. United States* (10th Cir. 1977) 563 F.2d 418, 423–24; *Wessinger v. Southern Ry. Co., Inc.* (D.S.C.1977) 438 F.Supp. 1256, 1259. And when the disposition of a case turns on a determination of intent, courts must be especially cautious in granting summary judgment, since the resolution of that issue depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination. *Denny v. Seaboard Lacquer, Inc.* (4th Cir. 1973) 487 F.2d 485, 491; *Schmidt v. McKay* (2d Cir. 1977) 555 F.2d 30, 37; *Mutual Fund Investors v. Putnam Management Co.* (9th Cir. 1977) 553 F.2d 620, 624; *Croley v. Matson Navigation Company* (5th Cir. 1970) 434 F.2d 73, 77, *petition for rehearing denied* 439 F.2d 788 (1971).[6] This is particularly so where the issue of intent relates to an ambiguous contract or document, "for the intent of the parties to an ambiguous contract is a question of fact which cannot properly be resolved on motions for summary judgment." *Cram v. Sun Insurance Office, Ltd.* (4th Cir. 1967) 375 F.2d 670, 674.

Since in antitrust cases "motive and intent play leading roles," these rules take on added importance in that context. *See Poller v. Columbia Broadcasting* (1962) 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458. This, however, is not to suggest that

---

**4.** Nissan seems to have objected to some of the interrogatories and the district court refused to compel answers.

**5.** He also complains of alleged improper restraints on discovery by the district court. Since we reverse the summary judgment granted for reasons hereafter given, any appeal connected with the discovery proceedings would be premature at this time and must be deferred until final judgment.

**6.** In *Mutual Fund Investors*, the Court said:

"Generally, when intent is at issue, a jury should be allowed to draw its own inferences from the undisputed facts unless all reasonable inferences defeat [the plaintiff's] claims."

Rule 56 is to be "read out of antitrust cases" or that every person who files an antitrust case is entitled to *"get to a jury* on the basis of the allegations of [his] complaint[s], coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, \* \* \*." *First Nat. Bank v. Cities Service* (1968) 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (emphasis added). But where the record generates a genuine dispute on the facts or on the inferences to be drawn from those facts—particularly where a critical issue in the case may be the construction of an ambiguous contract or document relative to intent—summary judgment is not warranted. We conclude that the record herein, viewed in the light most favorable to the plaintiff, does present a genuine dispute over the relevant facts and over the inferences to be reasonably drawn from such undisputed relevant facts as there are in the record. We accordingly reverse the judgment below.

▆▆ The critical fact in the case, which provides largely the linchpin for plaintiff's action, is the Flat Rate Manual. It is the source of the schedule of time charges which the plaintiff urges represents an illegal pricing mechanism. It was distributed to all its franchised dealers by Nissan and was in their possession admittedly as a guideline for charges to be made. It did set forth specific time charges for all repair work listed in the Manual. The repair work listed included both warranty work, payment for which Nissan was responsible, and non-warranty work, payment for which the customer himself was responsible. It at no point made any distinction between warranty and non-warranty repairs. In fact, the district court commented that the plaintiff had stated "probably correctly, that 'in fact, only a small percentage of the operations included in the Datsun Flat Rate Manual

would ordinarily be in the scope of the warranty.'" So far there is no disagreement.

The disagreement of the parties relates to the intention of Nissan and the dealers in the use of the Manual. It is the position of the defendants—and it is the position which was adopted by the district court in reaching its decision—that the evidence presented in support of the motion for summary judgment established beyond any dispute that the Manual was issued as a *unilateral* act, intended to be merely advisory on time charges to be made by the dealers on non-warranty repairs, and that this was the uniform manner in which the Manual was used by the dealers for non-warranty repairs. As such, they contended that *United States v. Colgate & Co.* (1919) 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, establishes that such action is not within the reach of the Sherman Act.

Without conceding that *Colgate* remains good law,[7] the plaintiff disputes the factual predicate for defendants' reliance on that authority. He begins by disagreeing with the defendants' premise that the Manual as an instrument for fixing standardized repair charges by Datsun dealers was Nissan's unilateral product. He argues, contrariwise, that the Manual was developed and maintained with due consideration by Nissan of suggestions and recommendations from the dealers themselves. The plaintiff relied for this position on certain undisputed facts in the record. From the outset, Nissan invited criticisms and suggested changes from its dealers in the time charges fixed in the Manual as a basis for repair charges. It even included in the Manual distributed to all the dealers a form to be used for this purpose. As a result of this invitation, Nissan received from its dealers

---

7. Though *Colgate* has been "called into question by subsequent decisions, *see United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), and *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964)," *see* White, J., concurring in *Continental T. V. v. GTE Sylvania Inc.* (1977) 433 U.S. 36 at 68, 97 S.Ct. 2549, 53 L.Ed.2d 568, it has been often followed by the courts. *Dillon Materials Handling, Inc. v. Albion Industries* (5th Cir. 1978) 567 F.2d 1299, 1306, n. 20, *cert. denied* 439 U.S. 832, 99 S.Ct. 111, 58 L.Ed.2d 127.

"hundreds" of proposed changes.[8] All of these were carefully evaluated by Nissan and changes in time charges for both warranty and non-warranty work were probably made as a consequence.[9] These changes were included in bulletins distributed to the dealers or in revised editions of the Manual itself. From this admitted procedure, it could be inferred that there was concert in the use, maintenance, and revisions of the Manual and its prescribed time charges and it could be properly argued, on this record so far that the Manual and its time schedules were the consensual product of Nissan and the dealers.

It cannot thus be said to be undisputed that the Manual was simply the "unilateral" production of Nissan; rather it could reasonably be that the Manual was maintained in consultation with Nissan's dealers and the time schedules it established were a commonly accepted collaborative standard for repair time charges to be used by the dealers in all repairs listed in the Manual. Any acts of collaboration in the fixing of charges controlling pricing of products or services, which interferes "with the setting of price by free market forces,"[10] may be sufficient to make an issue of fact whether the collaboration was sufficient to amount to an illegal combination under the Sherman Act. *See, United States v. Real Estate Boards* (1950) 339 U.S. 485, 489, 70 S.Ct. 711, 94 L.Ed. 1007; *Interstate Circuit v. U. S.* (1939) 306 U.S. 208, 226–27, 59 S.Ct. 467, 83 L.Ed. 610; *U. S. v. American Oil Co.* (1923) 262 U.S. 371, 389. "An agreement, shown either by adherence to a price sched-

ule or by proof of consensual action fixing the uniform or minimum price, is itself illegal under the Sherman Act, no matter what end it was designed to serve."[11] We accordingly do not believe that the record as presently developed is sufficient to make it an indisputable fact that there was not collaboration between Nissan and the dealers in formulating and maintaining the Manual's schedule of time charges, both for warranty charges and for the considerably larger non-warranty charges.

Neither are we prepared to hold that the record was undisputed that the Manual was purely advisory so far as non-warranty repairs were concerned. The contention of the defendants that the Manual was so intended is certainly not borne out by anything in the Manual itself. The absence of such a distinction in the Manual would justify an inference that its provisions were intended to apply equally to warranty and non-warranty items. If this reasoning were to be strictly followed, the fact that warranty time charges under the Manual were mandatory—which is the position of the defendants—would lead to an inference that similarly time charges for non-warranty items would be mandated. This is not to suggest that we think this the necessary or even the most plausible conclusion. What we do suggest is that such a conclusion is not so remote that it is to be resolved by a motion for summary judgment.

In fact, there is language in the foreword of the Manual, which gives support to plaintiff's argument that it cannot be said to be

8. In answer to an interrogatory, Nissan said in this connection:
  "Nissan U.S.A. has received hundreds of dealer requests for flat rate charges and their identification would constitute an undue burden. Accordingly, Nissan U.S.A. objects to this interrogatory. Nissan U.S.A. has kept requests for flat rate charges received since 1972 on file at Carson, California, and plaintiff may inspect and copy them there."

9. In one of its answers to interrogatories, Nissan said:
  "Modifications of the times in the flat rate manuals are customarily made as a result of requests by dealers or by district service managers. The Datsun Flat Rate Manual

provides dealers with a form for requesting such changes. See Datsun Flat Rate Schedule, p. 8. Upon receiving dealer requests for modifications, Nissan U.S.A.'s Technical Engineering Department performs repair operations in question in order to determine whether modification is required and, if so, whether it is required in the amount requested by the dealer. Nissan U.S.A. may then recommend a modification to Nissan, Ltd."

10. *United States v. Container Corp.* (1969) 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526.

11. *United States v. Real Estate Boards*, 339 U.S. at 489, 70 S.Ct. at 714.

undisputed that the Manual was not intended to be mandatory on the franchised dealers for all repair charges. Indeed, this statement in the foreword is apparently the only real declaration of the use to which the franchised dealers were expected to put the Manual. The language in question is:

"The time allowances established herein are the repair time standards which the entire Nissan Service System should follow. The standards are designed to be utilized by Nissan dealers in work process control for improved service shop productivity and efficiency. They also serve as useful references in estimating repair charges for customers and criteria for the evaluation of the skill level of each mechanic. Further, this manual provides dealers with standards which can be used when they make a claim upon Nissan Motor Company, Ltd., based on Nissan's warranty Policy."

The defendants are frank enough to concede that this language in the foreword of the Manual is ambiguous on whether the time charges prescribed there were intended to be merely advisory or mandatory. Actually they could not have done less in view of *Real Estate Boards*. *United States v. Real Estate Boards, supra,* 339 U.S. at 495, 70 S.Ct. 711. The district court agreed that the language in the foreword was ambiguous. A construction of this ambiguous declaration in the Manual as mandatory, coupled with the fact that the foreword makes no distinction between warranty and non-warranty work, would arguably remove the underpinnings from defendants' primary claim that the Manual was intended to be merely advisory with reference to non-warranty work. Since the construction of the ambiguous phraseology of the foreword is thus manifestly relevant in the resolution of the issues of this case, it would seem that *Cram v. Sun Insurance Office, Ltd., supra* [375 F.2d 670] forecloses summary judgment in this case.

The defendants claim, however, that the evidence of the undisputed use of the Manual by the franchised dealers removes any ambiguity in the language of the Manual and establishes indisputably that the Manual was purely advisory in relation to non-warranty work. Assuming that *Cram's* plain mandate may be avoided by this type of showing, we are not convinced that the record is undisputed on the facts, or on the reasonable inferences to be drawn from the facts, to the effect that the dealers did not follow the time charges in the Manual in their non-warranty repair charges.

Apparently, the factual basis marshalled by the defendants for their claim that the record attests indisputably the advisory character of the Manual is provided by (1) the affidavits of certain employees of the Datsun dealers in the Washington area filed by the defendants, and by (2) two affidavits from independent accountants reciting the results of their analysis of a random sampling of repair invoices by these Washington Datsun dealers. The affidavits of the employees of the dealerships are to the effect that, while such employees had had access to the Manual and in most instances had reviewed its schedule of time charges, the actual time charges fixed by their dealership for non-warranty repairs were determined by them and only in a limited number of instances did these time charges conform to those established in the Manual. And these employees add in their affidavits that Nissan has never criticized them for their failure to conform to the Manual in non-warranty repairs.[12]

The affidavits of the two Price Waterhouse accountants were offered by the defendants in order to give added support to the affidavits of the dealerships' employees. As we have said, these accountants took a random sampling of repair invoices by the

---

**12.** These declarations are undoubtedly relevant evidence but they are only that. This same claim was made in *Real Estate Boards* ("But departure from the prescribed rates has not caused the Washington Board to invoke any sanctions. Hence the District Court called the rate schedules 'non-mandatory,'") and was curtly dismissed by the Court:

"And the fact that no penalties are imposed for deviations from the price schedules is not material." (339 U.S. at 488–89, 70 S.Ct. at 714)

several dealers over a period of several years. They attempted to classify the charges for warranty and non-warranty repairs. Their next step was to compare the non-warranty charges with the time charges prescribed in the Manual. As a result of this calculation, they concluded that but a small percentage of such charges conformed to the prescribed time charges fixed in the Manual. There is one difficulty, however, in accepting this showing as establishing indisputably that the dealers did not follow the Manual in non-warranty repair jobs. The accountants make it clear in their affidavits that there were "many instances in which it was not possible to determine what the actual service operation involved or to locate, in either one or both of the flat rate manuals, an operation which seemed comparable to that which was described on a particular ticket," and, as to these instances, "[d]iscussions with representatives from each of the dealerships were necessary to resolve these questions." Because of this, the accountants added this *caveat* on the result of their calculations:

> "For those tickets on which we were unable to make a conclusive determination of the operation performed or identify a comparable operation in either one or both of the flat rate manuals, reliance on the representations of the respective dealership's representative was necessary."

It seems hardly fair to accept as indisputably true, for purposes of a motion for summary judgment, an accounting analysis based on statements from various individuals interviewed without any opportunity afforded the opposing party to cross-examine both the accountant and those from whom he secured the information on which he relied.

The evidence set forth in the affidavits of the dealers' employees is not, however, entirely undisputed in the record. The plaintiff relies on a statement made to him in connection with the charges for non-warranty repairs to his car, by an employee of VOB Datsun who was in apparent charge of the repair department at that dealership.[13] The plaintiff could not identify this employee who had made this statement to him other than by his first name "Jack". VOB Datsun should, though, have had no difficulty in identifying this employee by checking the invoices of work done for the plaintiff. In any event, the defendants do not profess in their briefs in this Court to be unable to identify or locate this "Jack" and obtain his version of his conversation with the plaintiff. And, more important, the defendants—neither Nissan nor VOB Datsun—sought to deny this conversation. Nissan for its part contents itself by merely declaring that any statement from "Jack" would not be admissible against it.

The ground of their objection to this statement of "Jack" as detailed by the plaintiff, is the alleged absence from the record of any evidentiary support for any possible finding of a conspiracy involving Nissan and VOB Datsun and, without such evidentiary support, it asserts that any statement of a VOB Datsun's employee is not competent evidence against it. This argument poses the question whether there was sufficient evidence of consensual action on the part of Nissan and its franchised dealers, including VOB Datsun, that the existence of collaboration may not be resolved by a motion for summary judgment.[14] We have already indicated that on

13. This showing by the plaintiff was:

> "On July 25, 1975, plaintiff was told by 'Jack', a supervisory employee of the VOB service department and the person identified on repair order number 26813 as a VOB 'service advisor', that VOB and all of the Datsun dealers charged not by the time actually spent but in accordance with a 'book', and that they are required to do so by their Datsun franchise agreements. On July 28, 1975 Plaintiff was shown a copy of such book at VOB's place of business, and he was told by Jack that the time to be charged for each service operation is set forth in the book; that VOB and all other dealers in the U.S. are required by the franchise contract with Datsun to use the book; and that anywhere in the United States, even in Tulsa, the same amount of time would be charged for a given job."

14. The statement of VOB Datsun's repairmen, it would seem, might be admissible on another

the record as presently developed it cannot be said that there is such an absence of evidence of concert of action that the inference of a combination under the Sherman Act is entirely inadmissible. The fact that the district court may have termed the evidence of consensual action as "thin" on this point offers no legal basis for summary judgment.

Moreover, the evidence relating to the plaintiff's non-warranty repairs of his car, considered along with the plaintiff's expert witness' affidavit, has some relevance to plaintiff's contention that the franchised dealers did use the Manual to fix time charges for non-warranty repairs. According to the defendants, there were twelve repair jobs performed by VOB Datsun on plaintiff's car. The plaintiff's expert avowed in his affidavit that five of these invoices covered work that could not possibly be identified as covered by the Manual.[15] Of the remaining seven invoices, he said the charges on one were too indefinite for classification and the charges on two others indicated by the size of the charges and the nature of the job that they covered other services than those in the Manual.

This might mean, if accepted, that the charges for the only four repair jobs performed on plaintiff's car, which could be clearly identified as within the strict coverage of the Manual's schedule, had been made on the exact basis of the Manual's time charges. And, on one occasion at least, as we have said, the repair manager stated he was using, and was bound to use, the time charges fixed in the Manual, when plaintiff complained of the charge made. All of this, of course, is not conclusive either on the proper classification of the work done on the course of the twelve jobs performed on plaintiff's car or in the use of VOB Datsun of the Manual in the way "Jack" said it was used, but it is evidence which cannot be disregarded on a motion for summary judgment as at least some circumstantial evidence that compliance with the Manual was understood to be required of the franchised dealers and was used by such dealers in making their charges for both warranty and non-warranty work.

It is not necessary and would perhaps be unwise to attempt any more extensive re-

theory. As we have pointed out, it is conceded that the Manual is ambiguous on whether it is mandatory or advisory in connection with non-warranty repairs. Nissan seeks to resolve this ambiguity in its favor by submitting affidavits from employees of its franchised dealers in the Washington area that they had never considered or treated the Manual as being mandatory in their time charges for non-warranty repairs. By the same token, the plaintiff is entitled to use the statement of another employee of one of these franchised dealers, with whom the plaintiff dealt, that they had treated and were required by Nissan to treat the Manual's time charges as mandatory in making charges for non-warranty repairs.

15. The expert witness' statement on this point is:

"7. Likewise, Mr. Frankin's analysis of the first item on attachment # 10, 1.2 hours for 'repair exhaust system,' is questionable. The work order itself in this case gives too little information for a reliable analysis proving that VOB's charge for this operation was *not* based on the Datsun flat rates as Mr. Rankin has attempted to show.

"8. The two remaining times are those in attachment # 5 (check and charge air conditioner) and attachment # 7 (check and re-

pair rear axle seals). In both cases, it appears that VOB charged far in excess of the times in the Datsun manual for the operations which Mr. Rankin's analysis identified as most closely comparable. However, in neither case is the wording of the repair order clear enough to determine precisely what work was performed, whether the correct operation has been identified in the Datsun manual, or how the work was charged for. For example, on the check and repair of rear axle seals, it is unlikely that it could have been performed without also removing the brake shoes, but Mr. Rankin's analysis apparently included no time for that part of the job.

"9. If the latter three operations are excluded from the survey because of the ambiguities and unclarity in the work orders, a total of 4 out of 4 operations—in other words, 100%—of the VOB work in question was charged for precisely in accordance with the Datsun flat rates. Even if the three later operations are counted despite the ambiguities, 100% of VOB's charges were equal to or higher than the Datsun times, and about 57% of the jobs were charged precisely in accordance with the Datsun book."

view of the facts which have been developed in the case. We are only concerned with the propriety of a grant of summary judgment. In making that determination, as we have already noted, we are only called upon to decide whether the district court erred in concluding there was no dispute in the facts or in the inferences from such facts. In deciding that the district court did err in granting summary judgment on that ground, we, of course, express no opinion on the weight of the evidence or the credibility of the witnesses. These are questions to be resolved by the trier of the facts. We might add that, had the district judge made his findings in this case after a trial and after the witnesses had been subjected both to direct and cross-examination, with an opportunity for the judge to observe the demeanor of the witnesses, we would have had no difficulty in concluding that such findings were not clearly erroneous. We conclude solely that, on the record presently made the district court should not have decided the disputed issues in the case by summary judgment.

The order granting summary judgment is reversed, the judgment entered thereon is vacated, and, the cause is remanded to the district court for further proceedings not inconsistent herewith.

REVERSED and REMANDED.