809 F.2d 1034
 Mitchell SUMMERLIN; Plaintiff-Appellant,
and
Dawn Edelin Summerlin; Plaintiff,
v.
Robert EDGAR; Defendant-Appellee,
and
Three (3) Unknown Named Federal Agents, Individually and as
Federal Agents Assigned To the U.S. Department of Treasury
Alcohol, Tobacco and Firearms Branch: Eight (8) Unknown
Named Prince George's County Police Officers, Individually
and as Police Officers; Prince George's County, Maryland, a
municipal corporation; David Porter; Michael O'Connell;
Ralph Ross; Peter Helwig; Stephen Mack; Robert Solomon;
United States of America; Mark Davis; Richard Pedersen, Defendants.
 No. 86-3989.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 13, 1986.
Decided Jan. 21, 1987.
 
 1
 Burt Michael Kahn (Shelly Eilene Mintz, Joseph, Greenwald & Laake, P.A., Hyattsville, Md., on brief), for plaintiff-appellant.
 
 
 2
 John Peter McKenna, Associate Co. Atty. (Thomas P. Smith, Co. Atty., Michael O. Connaughton, Deputy Co. Atty., Upper Marlboro, Md., on brief), for defendant-appellee.
 
 
 3
 Before RUSSELL and HALL, Circuit Judges, and McMILLAN, United States District Judge for the Western District of North Carolina, sitting by designation.
 
 McMILLAN, District Judge:
 
 4
 Plaintiff, Mitchell Summerlin, appeals from orders of the district judge, based on written evidence only, granting the motion of the appellee, Robert Edgar, for summary judgment and denying the appellant's motion for reconsideration.
 
 
 5
 We reverse.
 
 
 6
 Plaintiff sued appellee Edgar and several other law enforcement officers, alleging that he was unlawfully assaulted, beaten and damaged by them, in violation of the civil rights statutes, 42 U.S.C. Secs. 1981 and 1983, and of the United States Constitution. After becoming apparently satisfied that the defendant Edgar was the one who had inflicted the principal injury upon him, plaintiff took a voluntary dismissal as to all defendants except Edgar.
 
 
 7
 The question is whether the evidence before the trial judge was sufficient to support a finding of fact by a reasonable trier of fact in favor of the plaintiff against Robert Edgar. First National Bank v. Cities Service, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592-1593, 20 L.Ed.2d 569 (1968); Sartor v. Arkansas Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944); Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir.1980). After a careful review of the record, we are satisfied that obviously it will support such a finding and that plaintiff is entitled to a trial on the merits.
 
 
 8
 Rule 56, the summary judgment rule, in its core paragraph which affects this case, says:
 
 
 9
 "(c) Motion and proceedings thereon.... The judgment sought shall be entered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law...." (Emphasis added.)
 
 
 10
 Plaintiff, in pertinent part, alleges that on the afternoon of February 12, 1981, he and Dawn Edelin Summerlin lawfully occupied an apartment at 4111 33rd Street, Mount Ranier, Maryland; that the defendants, including Edgar, unlawfully entered the apartment and assaulted plaintiff, handcuffed him with his hands behind his back and struck him violently about the back of his head with a pistol. He and Dawn Summerlin were searched and restrained and were detained against their will. Plaintiff alleges serious permanent injuries from the blow or blows to his head, and other injuries. He seeks compensatory damages of $1,000,000.00 and punitive damages of $175,000.00, plus other relief.
 
 
 11
 Defendants denied liability.
 
 
 12
 Evidence supporting plaintiff's claims includes the following:
 
 
 13
 Robert Ralph Ross, by affidavit (J.App. 45-49), testified that he was a member of the Police Department for Prince George's County, Maryland; that a fellow officer told him that a wanted person, Sammy Dillon, was in a house at 4111 33rd Street in Mt. Ranier; that Dillon possessed several stolen weapons; and that there were arrest warrants on file for Dillon. A number of ATF (Alcohol, Tax and Firearms) agents and other law enforcement officers went to the 4111 33rd Street address, a building which "appeared to be a single family detached house" (J.App. 46). Met at the door by a person allegedly armed and believed to be Sammy Dillon, they kicked open the door, entered the house and took the weapon from that (unidentified) man (J.App. 47). (Thereafter, learning that the house contained other apartments, they searched the up stairs apartment, found Dillon and arrested him.)
 
 
 14
 Apparently not knowing that plaintiff Summerlin was not the Sammy Dillon they were looking for, the officers who had remained downstairs gave considerable attention to Summerlin. Plaintiff's description of those events, by deposition, appears at J.App. 162-66:
 
 
 15
 Q All right. Can you describe the first two men that entered the apartment?
 
 
 16
 A No, sir, I couldn't.
 
 
 17
 Q Can you describe the man with the gun who told you to turn around and face the bedroom?
 
 
 18
 A No, sir, I couldn't.
 
 
 19
 Q Can you describe the man who sat on you and put the gun in your ear?
 
 
 20
 A Other than being white males, I can't really give much of a description of them.
 
 
 21
 Q Okay. Can you describe the man that you say was 6 foot 2, bald, and took your wallet. Can you describe him any further than that?
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 And from there, they came into the apartment. I was told to face the bedroom. I put my hands up in the air. I was told to put my hands up in the air and face the bedroom. I was ... after that, I was taken ... I think I was thrown on the couch.
 
 
 25
 Q Can you tell us, without referring to your answered Interrogatory?
 
 
 26
 A Sure.
 
 
 27
 Q Okay. I think the last thing you said was you were "thrown on the couch." What occurred next, Mr. Summerlin?
 
 
 28
 A After I was thrown on the couch, I stayed on the couch for approximately thirty seconds, or so. Then, I was grabbed by my hair. I was led towards the bedroom. I heard my wife crying in the other room, "Please don't shoot." I don't know, she said, "Please don't shoot me," or "Please don't kill me." But she was stuck underneath the bed there and couldn't get out, or something another.
 
 
 29
 Shortly thereafter, I remember them grabbing me by the hair ... calling me, you know, this name or that ... instruct me to go towards the bedroom there. I didn't know what was going to happen next. I still didn't realize they were police officers. Nobody had identified themselves. I was led into the bedroom. There was like a wardrobe-type of thing where you kept clothes, and you know ... books or whatever, on it.
 
 
 30
 I was pushed up against that. And they stuck my head sort of like in a little cubbie hole there and patted me down for weapons and what not. And they led each one of us into the bedroom to do that. From there, I was brought back out of the bedroom. I was slung out of the bedroom, should I say. I landed on the floor. A guy came in ... grabbed me by the hair, again, and put me on the couch ... shoved me the way to the couch.
 
 
 31
 Then, he kept pushing my face into the couch there. He had a gun. I don't know what type of gun. He stuck it in my ear and saying things. I couldn't really make out what he was saying. He was telling me, "Don't move, be still, and shut your mouth," and what not.
 
 
 32
 From there ... okay. From there ... see, this is a long time ago to just, you know, spread it out exactly what happened. It's hard to do. It's a bad memory. From there, I believe another officer came in. And he was saying things. He kept calling me "Sammy." Okay. And I told him once or twice that I wasn't Sammy. And he didn't believe me. He was sure I was this Sammy Dillon. He was certain. I kept telling him to look in my wallet. I had a wallet in my back pocket. "Look at my license." He kept telling me, "Shut your mouth." And every time I tried, you know ... "Shut your mouth." The guy, he struck me a minor blow in the neck there.
 
 
 33
 Shortly thereafter, I kept asking, "What's going on? What do you want? Tell me what you want?" You know, "Maybe I'll help you." You know, I didn't know what they wanted, or anything. Another guy came in. He put a knee on my back there very forcefully, like he wanted to break my backbone, or something. I don't know. He then said something sort of ... like a lunatic speaking there ... like, say, "You wanted to snuff me out?" It was a different voice. I know that wasn't his normal voice ... speaking voice. In other words, he had a lot of built up anger in him from what I, you know, guess out of it.
 
 
 34
 He then, you know ... I believe I said, "Well, I'm not Sammy." I'd already told him that once or twice. I think he was a little irritated at me telling him I am not Sammy. "You got the wrong person." And, like I said, he said, "So you wanted to snuff me out." I know, like I said, the word "snuff" was used. I don't know if he said, "You wanted to snuff me out?", or how he put it, exactly. He then struck me in the head very forcefully ... quite a bit of pain. I wasn't unconscious. You know, it wasn't extreme pain. It was painful. I got a little dizzy for maybe 15 to 20 seconds.
 
 
 35
 A guy came in ... a white male. And he started going around me. I heard him saying, "That's not him. That's not Sammy." As I was saying, an individual came into the unit. And I heard, you know, people saying, "That's not him. That's not him." I don't know if that was the person, you know, that turned my head up and looked at me, that was speaking.
 
 
 36
 He then came to me, you know ... all this ... when he's saying, "That's not him," this was a five second period. In other words, they were trying to determine which one of us was this Samuel Dillon. He then got to me. And he was the only one that didn't treat me rough. He turned my head with his hand, not grabbing me by the hair, or being rough, or anything.
 
 
 37
 By sworn affidavit, plaintiff gave testimony as follows:
 
 
 38
 1. I make oath that the following facts are true to the best of my knowledge, information, and belief.
 
 
 39
 2. I have personal knowledge of the facts contained in this Affidavit.
 
 
 40
 3. I am competent to testify to all matters contained in this Affidavit.
 
 
 41
 4. That on February 12, 1981, I was in the apartment of Dawn N. Edelin (now my wife, Dawn Summerlin) at 4111 33rd Street, Mt. Ranier, Maryland.
 
 
 42
 5. That on the afternoon of February 12, the apartment was forcibly entered by a variety of Prince George's County police officers and Federal Alcohol, Tobacco and Firearms agents.
 
 
 43
 6. That when the police officers entered the apartment, I was told to put my hands into the air and face the bedroom of the apartment, which I did.
 
 
 44
 7. Thereafter, I was placed on the couch in the living room for approximately 30 seconds.
 
 
 45
 8. That subsequently, I was led toward the bedroom of the apartment where I was frisked for weapons.
 
 
 46
 9. That after being frisked for weapons, I was led back out into the living room.
 
 
 47
 10. That after being led back into the living room area, I was again told by a police officer to get on the couch in the living room, face down. The police officer who placed me on the couch on that occasion was, to the best of my knowledge, a caucasian male, who was armed with a pistol.
 
 
 48
 11. This police officer told me not to move, to be still and to shut my mouth.
 
 
 49
 12. The police officer applied force to my body in a downward direction while I was on the couch in order to keep me from moving.
 
 
 50
 13. I told the police officer who was applying force to my body that I was not the person he was looking for.
 
 
 51
 14. The police officer who had me on the couch, who was applying force to my body, struck me on the back of my head forcefully with an object which I believe to be a pistol.
 
 
 52
 15. That as stated earlier, although I was not permitted to see the face of the individual who struck me, I know that the individual was a male from having heard his voice and I know that the individual was a caucasian from having seen his hand. I know that the individual who struck me was heavy from having felt his weight applied to my back while I was on the couch.
 
 
 53
 16. That although there were several police officers who I encountered during this period, to the best of my knowledge, it was the individual who had me on the couch and who was applying weight to my body that struck me in the back of the head.
 
 
 54
 Plaintiff contends he suffers from epilepsy because of the blow on the head, and is required to take Dilantin for treatment (J.App. 169-176).
 
 
 55
 The witness Steven Princeler, by affidavit, testified that he was in the apartment when these events took place (J.App. 228); that he observed plaintiff being patted down by a police officer who later told him to lie down on the couch; that the police officer used force to keep Summerlin on the couch. In paragraph 11 he testified:
 
 
 56
 That after two or three occasions when Mitchell continued to attempt to get up and converse with the police officer, I heard that police officer state, "I told you to sit down" and thereafter I observed that police officer strike Mitchell Summerlin on the back of his head with the handle of a pistol.
 
 
 57
 (J.App. 229.)
 
 
 58
 The defendant Edgar testified by deposition that he was one of the officers who broke into the house; that they found three white males and one white female in the room and that none of them were armed (J.App. 196-7). No one resisted arrest. Edgar carried a 38 caliber police revolver and had it drawn when he entered the house (J.App. 197). He was the one who "patted Mitchell Summerlin down" and told him to sit on the couch (J.App. 201).
 
 
 59
 Summerlin testified that the individual who held him on the couch was the one who struck him with the gun (J.App. 163-6, 209-11); that the man who struck him was white because plaintiff saw his hand (J.App. 147); that he was male because he had a man's voice (J.App. 147); that he was armed with a Smith & Wesson revolver (J.App. 197); and that he was the man who had patted plaintiff down and made him lie down on the couch (J.App. 196).
 
 
 60
 Finally, Edgar testified that he saw no one other than himself who made physical contact with the plaintiff (J.App. 203); that he, Edgar, was the only individual who was near plaintiff or standing by him; and that he did not see anybody else strike the plaintiff (J.App. 204).
 
 
 61
 * * *
 
 
 62
 * * *
 
 
 63
 The above evidence, if believed, clearly raises "genuine issue[s] as to ... material fact[s] ...," i.e., whether the defendant Edgar forced plaintiff to the couch and struck plaintiff on the back of the head.
 
 
 64
 The issues should have been submitted to a trier of fact. A reasonable jury could properly have concluded from this evidence that plaintiff was injured by Edgar as he alleged.
 
 
 65
 There are other reasons why plaintiff is entitled to a new trial. They have to do with the apparent misapprehensions of law under which the trial judge seems to have been laboring. The judge appears to have assumed incorrectly (1) that deposition testimony could not properly be considered against defendant's affidavit on the motion for summary judgment (J.App. 284-86); (2) that the defendant's affidavit testimony that he did not strike the plaintiff had to be "countermand[ed] with another affidavit " (J.App. 286, 305, 324, emphasis added); (3) that plaintiff's own testimony by deposition and affidavit (which is part of the strong circumstantial evidence identifying Edgar as the one who hit him) was of no value because plaintiff, with his face in the sofa "doesn't see who hit him" (J.App. 289); (4) that the identification had to be by Summerlin himself, "not what somebody else says " (J.App. 290, emphasis added).
 
 
 66
 The judge further appears to assume incorrectly that he had to decide who was telling the truth. At J.App. 289, he said: "We don't know whether he is telling the truth or not. That is the whole point" (emphasis added). At J.App. 313, the court inquires: "Well, which am I to believe, that or your client's testimony?" (Emphasis added.)
 
 
 67
 Credibility of conflicting testimony is not, on a summary judgment motion, an issue to be decided by the trial judge. Morrison v. Nissan Motor Co. Ltd., 601 F.2d 139, 141 (4th Cir.1979); Cram v. Sun Insurance Office, Ltd., 375 F.2d 670, 674 (4th Cir.1967).
 
 
 68
 The judge's job in deciding a motion for summary judgment under Rule 56(c) is not to decide issues of fact, but to determine whether there is any genuine issue of material fact to be decided. Aetna Insurance Co. v. Cooper Wells & Co., 234 F.2d 342, 345 (6th Cir.1956); cf. Carpenter v. Harris, Upham & Co., Inc., 594 F.2d 388, 395 (4th Cir.1979).
 
 
 69
 The above testimony and reasonable inferences from it make it clear that, in the language of Rule 56(c), there is a "genuine issue" as to many a "material fact," and that the defendant was not entitled to a judgment in his favor as a matter of law. This record is laden with competent evidence which made the granting of summary judgment in favor of the defendant improper.
 
 
 70
 Plaintiff is entitled to a trial on the merits.
 
 
 71
 The judgment of dismissal is REVERSED.