**TENAX CORPORATION, Plaintiff and Counterclaim Defendant,**

v.

**The TENSAR CORPORATION, Defendant and Counterclaim Plaintiff,**

v.

**RDB PLASTOTECNICA SpA, and Mario Beretta, Counterclaim Defendants.**

**Civ. No. H–89–424.**

United States District Court, D. Maryland.

April 24, 1990.

---

**21.** It must be noted that the labor preemption argument raised in the complaint was not addressed in either motion for summary judgment. Therefore, this issue remains unresolved, and so only partial summary judgment can be granted here. Until this issue is addressed, this action remains open.

Alan Schwartz, and Weinberg and Green, Baltimore, Md., for plaintiff and counterclaim defendants.

Harvey Jacobson, Jr. and Fleit, Jacobson, Cohn, Price, Holman & Stern, Washington, D.C. and Max H. Lauten and Kramon & Graham, Baltimore, Md., for defendant and counterclaim plaintiffs.

## MEMORANDUM AND ORDER

ALEXANDER HARVEY, II, Chief Judge.

Presently before the Court in this patent case is plaintiffs' motion for partial summary judgment. Plaintiffs are Tenax Corpo-

ration (hereinafter "Tenax"), RDB Plastotecnica SpA (hereinafter "RDB") and Mario Beretta (hereinafter "Beretta").[1] They manufacture and retail a plastic netting product used in civil engineering projects. Plaintiffs have here sued Tensar Corporation (hereinafter "Tensar"), which also produces a competing plastic netting product. Plaintiffs seek a declaratory judgment that their product does not infringe two United States patents, under which Tensar manufactures and sells its product.

Discovery proceedings in this case have been extensive.[2] Supported by a lengthy memorandum of law and voluminous materials, plaintiffs have filed a motion for partial summary judgment, claiming that their product does not infringe the patents because the patents describe a manufacturing process and starting material that differ from plaintiffs' own process. Alternatively, plaintiffs contend that the patents are invalid under principles of estoppel, obviousness, anticipation and fraud.

Defendant Tensar has opposed the motion and has itself filed lengthy memoranda and numerous exhibits. Both sides have submitted physical samples of the products, and oral argument has been heard in open Court. For the reasons stated herein, plaintiffs' motion for partial summary judgment will be denied.

### I
### Background
### (a)
### The Parties

Tenax is a Maryland corporation with its principal place of business in Jessup, Maryland. Tenax imports into the United States from Italy plastic polymer geogrid products, including its so-called TT–AMP and LBO product series, and Tenax sells these products directly to contractors for use in civil engineering applications. Tenax imports these products from RDB, an Italian corporation which manufactures the prod-

---

1. As used herein, the term plaintiffs refers to plaintiff Tenax Corporation and counterclaim defendants, RDB Plastotecnica SpA and Mario Beretta.

2. There have been numerous discovery disputes which have required conferences and rulings by the Court.

ucts at its facilities in Italy. Tenax is a wholly owned subsidiary of RDB. Beretta is an Italian citizen and the chief executive officer of both RDB and Tenax.

Defendant Tensar is a Georgia corporation with its principal place of business in Morrow, Georgia. Tensar manufactures, distributes and sells plastic polymer geogrid products from its Georgia plant. The Tensar products consist of polymer geogrid products which, like the Tenax products, are used for soil reinforcement and other civil engineering applications.

Tensar is the exclusive licensee of both patents at issue in this case. The owner of the patents is P.L.G. Research Limited ("P.L.G."), an English patent holding company with its registered office in Lancashire, England. P.L.G. has appointed as its sole licensing agent Netlon Limited ("Netlon"), an English corporation with its principal place of business in Lancashire, England. Dr. Frank Mercer, the director and principal stockholder of both P.L.G. and Netlon, is the inventor of both patents. The patents are United States Patent No. 4,374,798 ("Mercer '798") and United States Patent No. 4,756,946 ("Mercer '946").

### (b)

### *The Products*

Mercer '798 (hereinafter the "Process Patent") entitled "Production of Plastic Mesh Structure," was issued by the Patent and Trademark Office (hereinafter the "PTO") to Dr. Frank Brian Mercer on February 22, 1983. Mercer '946 (hereinafter the "Product Patent"), entitled "Plastic Material Mesh Structure," was issued to Dr. Mercer on July 12, 1988. Both patents are directed to a method of producing a geogrid product from a "substantially uniplanar plastics starting material."

Geogrid products are netted structures composed of plastic polymers that have a strength which makes them suitable for use in mechanical and civil engineering projects. Uniaxial geogrids consist of a plastic starting material with a regular pattern of holes which, when stretched in one direction, form a strong netting structure ideal for shoring up earth embankments, dams, and retaining walls. Biaxial geogrids consist of the same starting material that is stretched in two directions at right angles to each other. Biaxial geogrids are used in heavy construction, such as the reinforcement of fill materials under highways or building foundations. Plastic netting material has advantages over a solid sheet of material like steel or concrete, because it is flexible and reduces stress and cracking.

These geogrid structures are made from plastic polymer sheets containing a rectangular pattern of holes. Under the patents, the starting material, which must be at least 0.75 mm thick, is stretched, causing the holes to expand into elongated spaces between solid bars of plastic and forming the netted structure. Difficulties in the manufacturing process arise because of the necessity that the plastic be stretched until the material is molecularly oriented. A product is molecularly oriented when the molecules of the elongated strands have moved, or are oriented into the junctions at the point where they meet the solid bar. This molecular orientation gives the plastic netting its high strength.

### (c)

### *The Manufacturing Processes*

Tensar manufactures its product by extruding a melted plastic polymer material as a solid flat sheet of plastic having a uniform thickness. Once it has cooled, the material is then "cold punched" to produce a regular pattern of holes across the plastic sheet. The plastic sheet is heated once again to a temperature below the softening temperature and is then stretched either in one or two directions to produce a plastic netting with the strength of a medium quality steel slab. The stretching results in an orientation of the molecules of the plastic around the junctions.

To produce the Tenax netting material, a melted plastic polymer is extruded through a cylindrical opening to form a circle of plastic material. Attached to the cylindrical opening are two die members which open and close over the melted plastic as it passes through the opening. The die members are cut like teeth to allow some plastic

to flow at all times, while interrupting the flow of some plastic when closed. This interruption of the plastic flow creates the holes in the sheet which, when stretched, will create the netting structure. Once the Tenax plastic material is extruded through the cylinder, it passes over a mandril and is cooled. The plastic cylinder is then cut into a plastic sheet. The sheet is stretched either in one direction to form the uniaxial geogrid or in two directions to form the biaxial geogrid.

It thus appears that the two processes differ in that Tensar cold punches a solid plastic sheet, while Tenax creates the holes by deforming the plastic material around the die teeth during the extrusion process. Tenax contends that this deformation at the time of extrusion causes molten plastic to gather thickly on the edges of the holes and gives the starting material a molecular orientation that differs from the Tensar starting material. In opposing the pending motion, Tensar asserts that evidence exists in the record here to support its contention that plaintiffs' products do in fact result from stretching substantially uniplanar starting materials.

## II

### *The Claims*

In late 1988, Tensar contacted Tenax and informed it that a Tenax product series, including products entitled TT2, TT3 and TT4, infringed both the Product Patent and the Process Patent. Tensar also informed actual and prospective customers of Tenax that the products infringed its patents and that the customers' use of the Tenax products would constitute infringement as well. In November, 1988, Tenax informed Tensar that it would discontinue distribution of TT2, TT3 and TT4. Shortly thereafter, Tenax began to import and offer for sale its TT, TT–AMP and LBO–AMP products. Tensar informed Tenax that these products also infringed the patents, whereupon, Tenax instituted this suit.

Since filing the original complaint on February 9, 1989, Tenax has filed three amended complaints, the last of which asserts seven claims against Tensar. Counts I and II of the third amended complaint seek a declaratory judgment that the TT–AMP product series does not infringe either of the patents in suit. Compensatory damages and injunctive relief are sought in Count III which alleges that Tensar, by informing plaintiffs' customers of their potential infringement liability, has interfered with their actual and prospective contractual relationships. Count IV of the third amended complaint seeks a declaratory judgment that the patents are invalid because Beretta was the true inventor and the patents were applied for and issued in the name of some one other than the true inventor. Count V alleges that the patents are invalid under 35 U.S.C. §§ 102, 103, and 112 because, *inter alia,* the patents were anticipated or obvious in view of the prior state of the art.[3] Counts VI and VII seek a declaratory judgment that the LBO–AMP product does not infringe the patents in suit.

Besides answering and demanding a jury trial, Tensar has filed a two-count counterclaim against Tenax, RDB and Beretta. Count I of the counterclaim seeks a declaratory judgment that the TT–AMP and LBO product series infringe both patents. Count II asserts a claim for trade dress infringement. In addition to compensatory and punitive damages, Tensar requests as relief a permanent injunction enjoining plaintiffs from producing either the TT–AMP or LBO products.

RDB and Beretta in turn have counterclaimed against Tensar. In Count I of their counterclaim, RDB and Beretta repeat the allegations contained in Count IV of the third amended complaint that Beretta invented the subjects of both patents, which were misappropriated by the patentee. Count II repeats the allegations of Count V of the third amended complaint that the patents are invalid because they fail to meet the statutory requirements for patentability. As relief, RDB and Beretta request that the Court either declare the

---

**3.** The allegations of Count V track each of the paragraphs of § 102. *See* 35 U.S.C. § 102(a)-(g).

patents invalid or transfer all rights in the patents to Beretta.

Plaintiff Tenax has moved for partial summary judgment under Counts I, II, and V of its third amended complaint, under Count I of Tensar's counterclaim, and under Count II of RDB and Beretta's counterclaims. The motion essentially presents issues whether the Tenax products infringe the patents in suit and whether the patents are invalid because the alleged invention was devised by one not named as the inventor or because of obviousness, anticipation, estoppel or fraud on the PTO.

### III

#### *Summary Judgment Principles*

As set forth in Rule 56(c), F.R.Civ.P., the standard for granting a motion for summary judgment is that the moving party show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The facts and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). The Fourth Circuit has consistently repeated its holding in *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.1951), *cert. denied* 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666 (1951), that summary judgment is a drastic measure that should not be granted unless it is perfectly clear that there are no genuine issues of material fact in the case and inquiry into the facts is not desirable to clarify the application of the law. *Ballinger v. North Carolina Agricultural Extension Service*, 815 F.2d 1001, 1004 (4th Cir. 1987), *cert. denied* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987); *Kirkpatrick v. Consolidated Underwriters*, 227 F.2d 228 (4th Cir.1955).

■ The Fourth Circuit has further held that summary judgment is seldom appropriate in cases in which particular states of mind are decisive as elements of a claim or defense. *Ballinger*, 815 F.2d at 1005, citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). In *Morri-*

*son v. Nissan, Ltd.*, 601 F.2d 139, 141 (4th Cir.1979), the Fourth Circuit cautioned that cases which turn on a finding of intent are not appropriate for summary judgment since resolution of that issue depends on the credibility of witnesses as determined by the trier of fact after observation of the witnesses' demeanor during direct and cross-examination.

■ In a patent case, fraud or inequitable conduct occurs when a patentee fails to disclose material information with an intent to deceive, and, when such a claim has been asserted, the elements of materiality and intent must be proved by clear and convincing evidence. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2068, 104 L.Ed.2d 633, (1989), citing *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed.Cir.1985). Prior art is considered to be material if "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *See A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1397 (Fed.Cir. 1986) (adopting PTO standard set forth at 37 C.F.R. § 1.56(a)). Intent to deceive is demonstrated by evidence, including that showing good faith, indicating sufficient culpability to support a finding of intent to deceive. *Kingsdown Medical*, 863 F.2d at 876. Proof of gross negligence alone will not suffice. *Id.* Any inquiry into fraudulent or inequitable conduct must be viewed in light of these standards.

The principles enunciated by the Fourth Circuit in the *Charbonnages* and *Morrison* cases thus apply with particular emphasis in patent cases involving issues of fraud or inequitable conduct. *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1573–74 (Fed.Cir.1985). Questions of good faith, intent to deceive, scienter, and honest mistake are all questions of fact. *KangaROOS*, 778 F.2d at 1573. In holding that such issues are not appropriate for resolution on a motion for summary judgment, the Federal Circuit has stated:

A summary judgment of fraud or inequitable conduct, reached while denying to the person accused of the fraud or inequitable conduct the opportunity to be heard on the issue, is a draconian result. *KangaROOS*, 778 F.2d at 1573–74.

When all these principles are applied to the facts of record here, this Court finds and concludes that plaintiffs' motion for summary judgment must be denied in its entirety. Issues of the sort presented in this case simply do not lend themselves to disposition by way of summary judgment.

## IV

### *The Parties' Contentions*

In their motion for partial summary judgment, plaintiffs first assert that their products do not infringe the patents because the Tenax products are not derived from a "substantially uniplanar starting material". Uniplanarity describes the vertical dimension of the starting material. A plastic sheet is uniplanar if it is of a uniform thickness such that bisecting the sheet vertically will divide it into two equal sheets. A biplanar sheet, in contrast, does not have a uniform thickness and consists of different levels of plastic strands whose parallel planes do not overlap.

In contending that their product does not infringe because it is not manufactured from a substantially uniplanar starting material, plaintiffs refer to various patents cited by the patentee during the prosecution of the patents in suit and characterized by the patentee as biplanar. Plaintiffs assert that if the products of those patents are biplanar, so must plaintiffs' product be biplanar.

In addition to their contention that no infringement has occurred, plaintiffs assert that the patents are invalid because the patentee made fraudulent statements [4] or failed to cite material prior art references during the patent prosecution. Plaintiffs

identify four instances of inequitable conduct in which the patentee allegedly engaged.

First, plaintiffs contend that the patentee deliberately represented to the PTO that uniplanarity was a fundamental element of the invention so as to distinguish the subject of the patents from prior art but that defendant now contends that uniplanarity is not fundamental in order that the method of the patents will encompass plaintiffs' products. It is argued that if uniplanarity is not fundamental as defendant maintains, then the patentee committed fraud in representing to the PTO that it was fundamental.

Plaintiffs next contend that in his prosecution of the patents in suit, the patentee engaged in inequitable conduct by deliberately omitting three material prior art references.[5] The three references are United States Patent 3,444,588 (hereinafter "Mercer '588") issued to the patentee in 1969, United States Patent 3,384,530 (hereinafter "Mercer '530") issued to the patentee in 1968, and a 1970 report released by Netlon to its customers (hereinafter the "Netlon Report").

Mercer '588 describes a method for producing a tubular plastic netting by stretching a plastic polymer of any thickness either uniaxially or biaxially to reach a certain molecular orientation. Mercer '530 also describes a process for manufacturing a plastic netting tube. The Netlon Report discusses increased strength obtained by molecular orientation through the junctions or nodes of plastic netting. Plaintiffs contend that these references would have been material to the prosecution of the patents in suit, that wrongful intent is obvious from the materiality of the prior art, and that the failure of the patentee to cite them constitutes inequitable conduct or fraud on the PTO.

As a third instance of alleged fraudulent conduct, plaintiffs assert that the patentee

---

**4.** Nowhere in Count V or elsewhere in the third amended complaint have plaintiffs alleged fraud on the PTO or inequitable conduct by Tensar. Nevertheless, the parties have presented arguments which appear to assume that claims of this sort have been or will be asserted in this case.

**5.** In their motion papers, plaintiffs identified six such references. However, at oral argument, counsel for plaintiffs stated that they were pursuing this issue only as to three of those six references.

made fraudulent statements by mischaracterizing the findings of one material prior art reference, United States Patent No. 3,252,181 (hereinafter "Hureau '181"). Plaintiffs contend that, in a 1968 patent prosecution, the patentee represented to the PTO that Hureau '181 was not an obstacle to issuing that particular patent because Hureau '181 discussed only uniplanar structures. In contrast, plaintiffs contend, the patentee during the 1988 prosecution of the Product Patent at issue in this suit stated that Hureau '181 was directed to biplanar structures. These statements, plaintiffs assert, misrepresented the teachings of Hureau '181 to the PTO.

The last type of fraudulent conduct which plaintiffs identify allegedly arises because of statements made in three declarations submitted as a part of the prosecution. In the declarations submitted to the PTO, Keith Martin, in attempting to distinguish the product from prior art, stated that the product required a starting material with a thickness above 0.75 mm and that a starting material below that thickness could not be stretched to produce the plastic netting. To establish the falsity of these statements, plaintiffs rely on affidavits of its experts and specifically on the results of experiments performed by one expert which apparently refute Martin's findings. Plaintiffs contend that intent to deceive is evident from the falsity of the Martin statements.

In addition to these arguments based on fraud, plaintiffs assert that the patents are invalid under principles of judicial estoppel[6] and that the inventions in question have been anticipated by and are obvious in light of pertinent prior art. Plaintiffs refer to various prior patents and other inventions in support of their argument that none of the elements of the inventions were unique or original. The state of the art was such, plaintiffs contend, that the patents should not have issued.

In response to plaintiffs' contentions concerning the issue of infringement, defendant asserts first that the Tenax product is substantially uniplanar, relying on the affidavits of its experts, Robert B. Gregory and John F. Witherspoon. Defendant claims that the Tenax product is not extruded so that the product forms tiers of plastic having different parallel planes and that the deformation which occurs at the die lips is not so great as to render the product biplanar. Defendant disputes plaintiffs' definition of the term "starting material" and, based on its own interpretation of the claims and specifications, argues that plaintiffs' products meet the requirement of substantial uniplanarity.

Insofar as plaintiffs' claims of fraud are concerned, Tensar disputes both the technical and scientific issues and the facts pertaining to the patentee's intent. Defendant argues, *inter alia,* that uniplanarity is not fundamental to the patents and refers to the claims of the patents and their definition of uniplanarity. As to the issue of prior art which was not cited, defendant asserts that the three references in question were not material to the prosecution of these patents and would have been merely cumulative in light of the other material references cited by the patentee. Defendant also disputes plaintiffs' assertions concerning the teachings of Hureau '181, concerning the affidavits and experiments of plaintiffs' experts and concerning plaintiffs' interpretations of prior art.

Further addressing the issue of intent, defendant argues that plaintiffs have not produced evidence of culpability which would support, as a matter of law, a finding of inequitable conduct or fraudulent intent. Defendant maintains that plaintiffs have done no more than merely infer intent from conduct characterized by them as egregious. This inference, defendant asserts, is not sufficient as a matter of law.

## V

### *Discussion*

■ From its review of the massive record in this case, this Court concludes

---

6. Plaintiffs cited no cases which support its arguments based on a theory of "judicial estoppel," and the Court has not found any authorities which would permit plaintiff to prevail under such a theory.

that plaintiffs have not met their burden of showing that issues of material fact do not exist. Plaintiffs are therefore not entitled to judgment as a matter of law on any of the counts at issue here. The issues of infringement and validity addressed in the pending motion cannot be determined as a matter of law. It will be necessary for the jury to hear expert and other testimony and to have an opportunity to judge the credibility of the witnesses. The Court concludes that all of the issues in dispute are inappropriate for resolution by way of a motion for summary judgment.

Questions pertaining to the extent to which a product is "uniplanar," "substantially uniplanar," or "biplanar" involve genuine issues of material fact which are clearly disputed by the parties. What constitutes the starting material is a question which involves a similar dispute of fact. The technical and scientific questions concerning the concept of uniplanarity and concerning other interpretations of the patents in suit and of prior patents cannot be resolved as a matter of law on the record presently before the Court. Only after the jury has considered all the testimony and exhibits will it be able to determine the issue of infringement, the issue of the materiality of prior art, the issue of the truth or falsity of statements relating to the teachings of Hureau '181 and the issue of the required thickness of the starting material. The affidavits submitted by the parties are conflicting, and those relied upon by plaintiffs do not establish as a matter of law the material facts at issue. Since the parties have presented conflicting interpretations of the technical and scientific issues, cross-examination of the experts and other witnesses is of particular importance in this case.

Insofar as the issues of inequitable conduct and fraud are concerned, summary judgment is particularly inappropriate. To prevail in their assertion that the patentee acted inequitably, plaintiffs must prove the patentee's intent to deceive. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., supra,* at 876. Gross negligence does not of itself justify an inference of intent to deceive the patent examiner. *Id.*

Rather than establishing that no genuine issue of material fact exists as to their claims of fraud, plaintiffs have done no more than raise issues of material fact. In this case, questions pertaining to the patentee's intent are linked closely to the technical and scientific questions and may be resolved only after evidence pertaining to those issues has been presented. Issues of fraud and intent to deceive present questions of fact particularly inappropriate for resolution on a motion for summary judgment. *Morrison v. Nissan, Ltd., supra.* On this record, it is apparent that plaintiffs have not met their burden of establishing fraud or inequitable conduct as a matter of law.

For the reasons stated, it is this 24th day of April, 1990, by the United States District Court for the District of Maryland,

ORDERED that plaintiffs' motion for partial summary judgment be and the same is hereby denied.